DANIELS v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1912.)

No. 2,209.

1. PERJURY (§ 32*)—EVIDENCE—RELEVANCY.

In a prosecution for perjury, in which defendant was charged with having testified falsely on his examination as a bankrupt that a check given by him a short time before his bankruptcy was in payment of a bona fide debt, where the payee testified that such was not the fact, but that he cashed the check and paid the proceeds over to defendant, evidence of other facts directly tending to show that the check was given as part of a scheme to defraud creditors was relevant.

[Ed. Note.—For other cases, see Perjury, Cent. Dig. §§ 108–116; Dec. Dig. § 32.*]

2. BANKRUPTCY (§ 242*)—EVIDENCE—FALSE TESTIMONY BY BANKRUPT—PRIVILEGE.

The provision of Bankruptcy Act July 1, 1898, § 7a (9), c. 541, 30 Stat. 548 (U. S. Comp. St. 1901, p. 3424), that no testimony given by a bankrupt on his examination "shall be offered in evidence against him in any criminal proceeding," has reference only to crimes committed previous to the giving of such testimony, and not to any criminal proceeding based on a crime inherent in the bankrupt's examination, and in a prosecution for perjury committed during the examination the alleged false testimony not only may be given in evidence, but any other testimony of defendant given in the examination which is relevant to the issue and tends to establish the falsity of that on which the prosecution is based.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 399–401; Dec. Dig. § 242.*]

3. WITNESSES (§§ 352, 374*)—IMPEACHMENT—COMPETENCY OF IMPEACHING EVIDENCE.

The credibility of a witness cannot be tried by raising and trying an independent issue as to his honesty, his interest, or his motives.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1152, 1201, 1202; Dec. Dig. §§ 352, 374.*]

4. PERJURY (§ 29*)—VARIANCE—UNNECESSARY AVERMENTS.

On the trial of an indictment for perjury charging that defendant testified on his examination as a bankrupt that a check given by him a short time before bankruptcy for more than $1,700 was in payment of an in-

debtedness, whereas he did not in fact owe the payee to exceed $50, the government was not held to the exact limits so stated, and testimony by the payee of the check, that defendant may have owed him $200, was not a fatal variance; the averment of the exact amount due being unnecessary.

[Ed. Note.—For other cases, see Perjury, Cent. Dig. §§ 97–106; Dec. Dig. § 29.*]

5. PERJURY (§ 26*)—INDICTMENT—DESCRIPTION OF OFFENSE.

An indictment for perjury under Pen. Code, § 125, Act March 4, 1909, c. 321, 35 Stat. 1111 (U. S. Comp. St. Supp. 1911, p. 1625), which makes it essential to the offense that the false oath should be concerning a matter which defendant "does not believe to be true," *held* sufficient where, after reciting the testimony given by the accused relating to different matters, it continued: "All of which statement the said (defendant) did not believe to be true."

[Ed. Note.—For other cases, see Perjury, Cent. Dig. §§ 90–94; Dec. Dig. § 26.*]

6. CRIMINAL LAW (§ 941*)—MOTION FOR NEW TRIAL—GROUNDS—CUMULATIVE EVIDENCE.

Evidence offered by affidavit on a motion for new trial *held* cumulative and the overruling of the motion within the discretion of the court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2328–2330; Dec. Dig. § 941.*]

In Error to the District Court of the United States for the Southern District of Ohio.

Criminal prosecution by the United States against Meyer J. Daniels. Judgment of conviction, and defendant brings error. Affirmed.

The plaintiff in error was convicted of perjury under section 125 of the Penal Code. He had been adjudicated an involuntary bankrupt, and the perjury alleged consisted of a false oath concerning a check which he had given to one Hassel for the sum of $1,776.50. Daniels had been engaged in pawnbrokering and other business, at Columbus; Hassel had been in his employ and had been entitled to share the profits of one branch of the business; Daniels delivered this check to Hassel, and also delivered to an attorney a general assignment to Hassel, under the laws of Ohio, for the benefit of Daniels' creditors. Daniels then immediately left Columbus, and went to Hot Springs, Ark., where he remained several months. Having been, in the meantime, adjudged a bankrupt, he returned to Columbus and submitted to a general examination before the referee. During his examination he testified that on January 11, 1910, the date of the check, he was actually indebted to Hassel in the sum of $1,776.50, and that the check was delivered and received in payment of this actually existing debt. It is this testimony which the indictment alleges to be false.

J. M. Butler and T. E. Powell (Butler & Carlile, on the brief), for plaintiff in error.

S. T. McPherson, U. S. Atty., and Thos. H. Darby, Asst. U. S. Atty.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] 1. On this trial, Hassel testified that, when he received the check, Daniels did not owe him anything more than a few dollars; that the check was a sham; and that he (Hassel) immediately drew the money

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

out of the bank upon the check and turned the money over to Daniels. Thereafter the government was allowed to prove, against Daniels' objection, his own statement, appearing in the course of his same examination before the referee, that when, on January 13th, he went to Hot Springs, he took with him $8,000 or $9,000 in cash and $3,000 or $4,000 worth of diamonds. The objection was that this testimony was not relevant to the issue, and did not tend to corroborate Hassel.

To say that this testimony was not relevant to the issue is to take too narrow a view of relevancy, and to look only at the form of the issue and not at the essence. Daniels did give the check to Hassel. That was not in dispute. The thing in controversy was whether Daniels testified to the truth when he said that he did owe Hassel this amount of money, or whether Hassel spoke the truth when he denied such indebtedness. We need look only at the situation to see that the real issue was the affirmance on one side that the debt existed and that the check was a good-faith transaction in discharge of the debt, and the assertion, on the other side, that the giving of the check was a step in a scheme by Daniels to defraud his creditors by pretending to pay a debt when he was really getting the cash into his own hands to keep it there. It was impossible to try one half of this issue, without trying the other half; and whatever was relevant to show that the check was given by Daniels as a step in a scheme to defraud his creditors was relevant to show that the check was not given in good faith for an honest debt.

Where the situation involves two inconsistent alternatives, the existence of one of which would make the other impossible, and the direct thing to be proved is that one did not exist, evidence directly tending to show that the other did exist is inherently relevant The principle that is thus stated must be applied with due regard to the rule of remoteness, and much evidence, not too remote and therefore properly admissible if the primary issue were as to the existence of the other, must be excluded on the trial of the issue as to the non-existence of the one, for the reasons which exclude evidence bearing only remotely on the issue. As applied to the present case, the rule would not permit the general trial of the question whether Daniels was engaged in a scheme to defraud his creditors, to the same extent as if that were the primary dispute, but it would permit testimony directly tending to show that the check was given as a part of such scheme; and to this conclusion the existence of the scheme is essential. The proofs that Daniels gave this check, that it practically exhausted his money in the bank, that he executed an assignment for creditors, and that, instead of turning over to his assignee the large amount of cash and convertible property he had on hand, he took it with him, and his creditors never got it—all these things occurring practically simultaneously—do tend to show that they were all interwoven as parts of one transaction, and all have a direct bearing on the character of the check.

We do not overlook the fact that the existence of a scheme to defraud creditors, and in that connection taking the money away, is

not, necessarily, inconsistent with the presence of an honest debt to Hassel. If it were, then proof of these things would be absolutely and directly relevant and no question would exist; but while there is no necessary inconsistency, we think that such facts, in the association in which they here appear, have a tendency to indicate the bad faith of the whole transaction, and such a direct, as compared with a remote, tendency that the proof was properly admissible.

We refrain from any discussion or analysis of the many decisions on the subject of relevancy, cited in the briefs. Each case involves an application to its facts of the well-understood general rules. These are well stated in Elliott on Evidence, vol. 1, p. 143 et seq., where the conclusion is reached (section 44):

"Facts relevant to the issue are facts from the existence of which inferences as to the truth or existence of the facts in issue may justly be drawn. As a general proposition, therefore, it may be said that any evidence that tends in any considerable degree to establish the probability or improbability of a fact in issue, no matter how slight its weight may be, is relevant. * * * It is not necessary, however, that it should in itself bear distinctly upon the point in issue, for if it is but a link in the chain of evidence tending to prove the issue by reasonable inference, it may nevertheless be relevant."

Again, Prof. Thayer, in his Preliminary Treatise on Evidence at Common Law, p. 265, after saying that matters not logically probative are forbidden, continues:

"How are we to know what these forbidden things are? Not by any rule of law. The law furnishes no test of relevancy. For this, it tacitly refers to logic and general experience—assuming that the principles of reasoning are known to its judges and ministers, just as a vast multitude of other things are assumed as already sufficiently known to them."

In reaching our conclusion that the evidence was relevant, we have, as we think, applied the proper inferences drawn from "logic and general experience."

2. The same considerations dispose of the exceptions based upon the admission of evidence to show that this check practically exhausted Daniels' bank deposit, and left only an inconsiderable balance, and also those based upon the claim that Hassel's testimony was not corroborated.

[2] 3. The assignments of error present the claim that Daniels is immune from this prosecution for perjury, and because of that clause of subdivision 9 of section 7 of the Bankrupt Act which, with reference to the bankrupt's examination before the referee, says, "But no testimony given by him shall be offered in evidence against him in any criminal proceeding." Since this case came into this court, the decision of the Supreme Court in Glickstein v. United States, 222 U. S. 139, 32 Sup. Ct. 71, 56 L. Ed. ——, has settled, adversely to respondent, his claim of immunity; but another question of the application of this clause remains, and is in this record raised by suitable objection, exception, and assignment of error. It is said that although Daniels may be prosecuted for perjury in falsely testifying in one part of his examination that the check was a good-faith transaction, and although in such prosecution his

testimony to that effect during the examination may be given in evidence as the necessary basis of the indictment for perjury, yet that the decision of the Supreme Court goes no further, and the broad and general language quoted from the statute forbids the government from using any other part of his testimony as evidence of the falsity of that portion which is charged to be perjury. It must be said that the apparent meaning of the language, read by itself, is in accordance with respondent's contention; but it is equally true that this same superficially correct construction leads to the result which the Supreme Court, in the Glickstein Case, refused to accept, and, in the language of that court, converts the immunity clause into a license to commit perjury. It follows that this superficial construction cannot be and is not according to the real intent of Congress, and that we must find that real intent, as applied to the present situation, and as we are instructed by the Glickstein Case.

This holding of the Supreme Court cannot be treated as merely a decision that, because of the necessities of the case, perjury will lie; it must be treated as holding that, because of the necessities of the case, the language of the statute will receive a reasonable rather than a literal construction, and that, as the result of such reasonable construction, it is found that perjury may be so predicated. What, then, is this reasonable construction, to be applied to other situations as well as to the Glickstein Case? It is that the purpose of the so-called immunity clause is to supplement the constitutional provision against compelling self-incriminating evidence, or, rather, to minimize the possible obstructive effect of this provision; that this constitutional provision can have reference only to crimes which have already been committed at the time when the evidence is compelled; that this statute must have the same construction; and so that it does not have reference to any criminal proceeding based on a crime inherent in the bankrupt's examination. Applying this construction, it is manifest that, where the bankrupt is indicted for testifying falsely in one part of his examination, his testimony in other parts of the same examination, if tending to support the indictment, may be given in evidence against him. Edelstein v. U. S. (C. C. A. 8) 149 Fed. 636, 642, 79 C. C. A. 328, 9 L. R. A. (N. S.) 236.

Counsel for Daniels urge that the crime of perjury was complete and finished (if ever). when, in the early part of his examination, Daniels testified that he did owe Hassel the debt purporting to be paid by check, and hence that his later testimony, over which this controversy arises, referred to a crime then completely committed and in the past. No such arbitrary dividing line can be drawn through the bankruptcy examination. The result would be that in a prosecution based on the earlier testimony, the later inconsistent statement could not be received, while in a prosecution based on the later statement, the earlier one would be admissible. The examination may last over several hours or several days; but it must, for the present purpose, be considered as an entirety, and all must speak. as of the time when the oath was administered and the testimony commenced.

We do not fail to observe that it follows, as a necessary corollary

from this construction, that the bankrupt cannot be compelled to testify in any particular in which the immunity does not protect him, and so that, if he feared a charge of perjury upon that portion of his testimony already given, he could, upon subsequent questions, claim his constitutional privilege; but while this may, in an exceptional case, prevent the contemplated full disclosure, the danger of such result cannot be effective to prevent what we think the necessary construction of the section.

[3] 4. In the examination of Hassel, it appeared that after Daniels went away, and before the bankruptcy officials took possession, Hassel was in charge of the store, practically as agent for Daniels, and on Hassel's cross-examination there were intimations or efforts to show that he had not faithfully accounted to any one for the proceeds received, and, in effect, that he had embezzled such proceeds. This had no direct bearing on the issue, but was in the nature of an attack on his credibility. Later, Daniels put on a witness and sought to prove the amount of money which had thus come into Hassel's possession. The court excluded the evidence. This ruling was right. Hassel's credibility as a witness could not be tried by raising and trying an independent issue as to his honesty, his interest or his motives.

[4] 5. The indictment charged that, at the time Daniels gave Hassel the check for $1,776 in pretended payment of a debt of the same amount, Daniels was not indebted to Hassel in that amount "or any similar amount or any amount in excess of $25 or $50." On the trial, Hassel testified that Daniels did then owe him a small amount, he did not know just how much, but not exceeding $200. At the end of the charge, the district attorney suggested that the government ought not to be limited to the $25 or $50 named in the indictment, and that even if Daniels owed Hassel $250 or $300, that alone should not defeat the verdict of guilty. The court then told the jury:

"The government is not restricted to the averment as to that amount. I have said it is for you to determine whether or not there was anything owing to Hassel, and, if so, the amount, and a considerable variation from that amount would not, in and of itself, operate against the government in this case."

Objection is now made that this charge led the jury to find Daniels guilty, though the government had failed to prove its allegation as to the nonexistence of any debt in excess of $50.

We see no reason why the government should be held to the exact limits of these figures stated in the indictment. The essential thing charged was that Daniels did not owe the debt which he was pretending to pay, but that such debt, or a substantial part of it, was fictitious, and it was not necessary to allege that whatever real debt, if any, existed did not exceed any particular amount. Even so, such an allegation might sometimes mislead a respondent or confuse the jury as to the real issue, so that respondent would have a right to complain; but we think not in this case. There is nothing in the record indicating that Daniels claimed the existence of any debt except the entire, full debt which he was assuming to pay, and nothing to indicate the existence of any other debt, save the one which Hassel

recited as above described. The phrase found in the quoted charge, to the effect that a "considerable variation" from this amount would not be material, would be objectionable if it could be construed by a jury as meaning that Daniels might be convicted even though he did in fact owe Hassel a debt large enough, so that the giving of the check for the amount named might have been the result of confusion or mistake as to the real debt, but in connection with the record before the jury and the district attorney's request, this charge meant that variation, even up to the total of about $200, would not be fatal; and, so construed, it was proper. The honest giving of a check for $1,700 cannot be proved as a good-faith payment of a debt of that amount by showing that there was real indebtedness of $200.

[5] 6. The indictment recited Daniels' testimony, that he was indebted to Hassel in the amount named, that he paid Hassel that sum of money, and that such payment was a liquidation of such indebtedness, and then continued, "All of which statement the said Daniels did not believe to be true." The perjury provision of the Penal Code makes it essential to the offense of the respondent that the false oath should be concerning "matter which he does not believe to be true." The indictment must therefore sufficiently allege such nonbelief. The point made against this indictment is that it charged the giving of testimony upon three matters—the debt, the payment and its application—and by saying "all of which statement the said Daniels did not believe to be true," it was not charged that he did not believe any of it to be true, or that he believed each of the three statements to be untrue. It is urged that the language of the indictment is consistent with Daniels' full belief in the truth of one or two out of the recited statements and is, therefore, insufficient; and we are cited to grammatical authority to the effect that "all," used in a negative sentence, is often ambiguous and is not equivalent to "each of," and to many decisions concerning the strictness and accuracy required in indictments for perjury. This criticism upon the indictment is, as a matter of nicety, well taken; but we believe it to be overnice. In such ambiguity as exists, we fail to find any failure to state facts constituting a crime or any tendency to mislead the respondent or any danger that he will be exposed to a second prosecution on account of any of the subject-matter—and these are the tests which will in most cases determine the sufficiency of the description of the offense as found in an indictment. U. S. v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588; Bennett v. U. S. (C. C. A. 6) 194 Fed. 630.

[6] 7. During the trial, Daniels called four witnesses who testified that, after the bankruptcy, Hassel had repeatedly stated that Daniels had in fact owed him the $1,776 debt paid by this check; that he (Hassel) had the money and was entitled to it and could hold it against the trustee. Evidently the jury believed that, if Hassel made these statements, he was not then telling the truth, but was telling the truth while testifying on the trial before the jury. On a motion for a new trial, Daniels produced affidavits from 20 witnesses that they would testify to various and frequent statements by Has-

196 F.—30

sel between April, 1909, and January, 1910, that Daniels was owing him $2,000, and that he expected to get the money whenever Daniels sold his property. The court denied the motion for a new trial, and such denial is now said to be error, because the right to a new trial under these affidavits was clear and its refusal was an abuse of discretion. The failure to get the evidence during the trial was fairly well accounted for; and without deciding the point, we may assume, as the trial judge did, that his duty to grant a new trial turned upon whether this evidence was cumulative. He thought it was, and we approve his conclusion. It is true that the similar testimony on the trial related to Hassel's statements after the controversy had arisen, while the statements recited in the affidavits were made as the matters were occurring and before the bankruptcy; but, in spite of this, all this evidence was of the same general character. It all went to dispute Hassel's testimony by showing that he had previously made inconsistent statements. When such statements of the later date had been proved, evidence of similar statements at an earlier date, though perhaps stronger proof, was still of the same character and to the same point, and was therefore cumulative. Being so, it was within the discretion of the trial judge to conclude that such proofs did not entitle respondent to a new trial.

The judgment is affirmed.