UNITED STATES of America

v.

Stanley APFELBAUM, Appellant.

No. 77–2427.

United States Court of Appeals, Third Circuit.

Argued June 6, 1978.

Decided Aug. 10, 1978.

Robert E. Madden, Sp. Atty., Dept. of Justice, Robert N. deLuca, U. S. Atty., E. D. Pa., Philadelphia, Pa., Robert J. Erickson, Vincent L. Gambale, Attys., Dept. of Justice, Washington, D. C., for the U. S.

Before ADAMS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

■ This appeal calls upon us to examine the contours of the permissible use by the Government of immunized grand jury testimony where that testimony does not constitute the *corpus delicti* or core of a defendant's false swearing indictment. In resolving this issue, we recognize the tension created by the conflicting interests between the power of a grand jury to compel testimony and a witness's privilege against self-incrimination. Following the teaching of *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and the precepts established in this court's precedents, *see United States v. Frumento,* 552 F.2d 534, 542–43 (3d Cir. 1977) (en banc); *United States v. Hockenberry,* 474 F.2d 247 (3d Cir. 1973), we hold that grand jury testimony which is compelled under a grant of immunity may be utilized only as the *corpus delicti* of an indictment for perjury or for false swearing. *See* 18 U.S.C. § 6002.

### I.

On December 13, 1976 and January 3, 1977, Stanley Apfelbaum, then an administrative assistant to the District Attorney in Philadelphia, appeared as an immunized witness before a federal grand jury.[1] The grand jury was investigating criminal activities (including racketeering and extortion) alleged to be involved in the operation of a Chestnut Hill automobile dealership in Philadelphia.

In response to questioning before the grand jury, Apfelbaum made two series of

Joel Harvey Slomsky, Philadelphia, Pa., for appellant.

1. Immunity had been granted in accordance with 18 U.S.C. § 6002, *quoted in full in* n. 8 *infra.*

statements which served as the basis for his subsequent false swearing indictment and conviction. In his December 13th grand jury testimony *he denied that he had tried to locate one Harry Brown in Fort Lauderdale, Florida during the month of December 1975.*[2] Then, on December 13, 1976 and again on January 3, 1977, Apfelbaum testified before the grand jury that *he did not recall telling F.B.I. agents that he had loaned $10,000 to Brown.* The grand jury which heard these two statements returned an indictment against Apfelbaum which charged him with two counts of wilfully and knowingly making false material declarations before a grand jury in violation of 18 U.S.C. § 1623.[3]

With respect to Apfelbaum's "locating Brown," paragraph 5 of Count One of the indictment recited Apfelbaum's grand jury testimony. That testimony and the charging clause of the indictment follow:

Q. It's my understanding you went down to Florida in December of 1975, approximately the 5th of December.

A. That's right. That's what I said before.

Q. Now, at that time did you see Mr. Brown?

A. No. I told you I went down there for a fishing trip, not fishing trip, to look at a boat for Dr. Slawek and then go to Puerto Rico.

Q. And you only stayed in Florida about three days?

A. About three or four days, something like that. I'm not sure exactly. Don't hold me to three or four. It was around that. I spent a total time of about two weeks between the two, including flight time and so on.

Q. When you were down there, did you call up Harry Brown to talk to him?

A. No.

Q. Did you know he was down there?

A. I heard he was down there. Somebody had said he was down there.

Q. Did you do anything to attempt to contact Mr. Brown when you were down there?

A. Not that I remember. I don't think I knew where he was at.

Q. Well, how did you find out where he was at eventually?

A. Somebody had told me about it and I don't know who, but they told me he was down in Florida.

Q. Okay. By this time, had the papers reported that Harry Brown was missing?

A. I don't believe so. I don't know. I'm not sure. I'm trying to recollect. I don't know whether they said he was missing or not.

Q. So, in December, when you were down there, you're sure you didn't try to contact Harry Brown; is that correct?

A. Yeah, Yeah.

Q. Did you try to locate Harry Brown when you were down there?

A. No.

Q. You're sure?

A. Positive.

Q. Now, did you tell anyone that you were trying to locate Harry Brown in Florida?

A. Not that I remember.

Q. And, you know, you were on your vacation and you were looking at the boats, so you weren't running around trying to find somebody you didn't know where they were, is that correct?

A. Yeah.

Q. And you would remember that?

A. Yeah, I think I would.

Whereas, in truth and fact, as Stanley Apfelbaum then well knew, he had tried

---

**2.** Harry Brown was the general manager of Chestnut Hill who was subsequently convicted of collecting extensions of credit by extortionate means (in violation of 18 U.S.C. § 894); mail fraud (18 U.S.C. § 1341); racketeering (18 U.S.C. § 1962); and conspiracy (18 U.S.C. § 371).

**3.** 18 U.S.C. § 1623 provides in pertinent part:

(a) Whoever under oath . . . in any proceeding before . . . [a] grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

to locate Francis Harry Brown, aka Harry Brown, in Florida, during December of 1975.

With respect to Apfelbaum's failure to recall his loan discussion with the F.B.I., paragraphs 4 and 5 of Count Two of the indictment recited Apfelbaum's grand jury testimony. That testimony and the charging clause follow:

Q. Did you ever tell anyone that you had lent any money to Harry Brown or Marvin Greenblatt?

A. No, sir.

Q. Did you ever tell anyone that you had been involved in a loan to Harry Brown or Marvin Greenblatt?

A. No, sir.

Q. You never told anyone that you had been involved in any kind of loan to Harry Brown?

A. No.

\*   \*   \*   \*   \*   \*

Q. Did you ever tell the F.B.I.—you denied last week that you told anyone you had lent money to Harry Brown?

A. That's right.

Q. You denied that?

A. How could I lend money when I don't have any money myself, Mr. Friedman?

Q. So, you didn't tell the F.B.I. or anyone that you had lent money to Harry Brown?

A. No, sir.

Q. Is that right?

A. That's right.

\*   \*   \*   \*   \*   \*

Q. Now, sir, in 19—what, 1975 and 1976, did you have $10,000?

A. Did I what?

Q. Have $10,000?

A. I told you I didn't have $10,000.

Q. And, you didn't lend $10,000 to Harry Brown, is that right?

A. No, sir.

Q. And, you testified that way last week.

A. Yeah.

Q. You testified last week that you never told anyone that you had lent $10,-000 to Harry Brown; is that right?

A. That's right, sir.

Q. Okay. And, you still persist in that testimony?

A. Uh-huh. How can I lend it to him when I didn't have it? I had to go to the bank and borrow money myself.

Q. You still persist in that testimony?

A. Yes, sir.

Q. You never told the F.B.I. that you lent Harry Brown $10,000; is that right?

A. If I did, it was ridiculous.

Q. Did you tell them that?

A. I don't know. I don't think I did.

Q. Do you have any recollection of telling them that?

A. No, no sir.

Whereas, in truth and fact as Stanley Apfelbaum then well knew, he (Stanley Apfelbaum) had told someone, to wit, agents of the Federal Bureau of Investigation, that he (Stanley Apfelbaum) had lent ten thousand dollars ($10,000) to Harry Brown.[4]

At the trial upon the indictment, the Government produced evidence in support of its charges that Apfelbaum's statements

---

**4.** The indictment (Indictment No. 77–317) is reproduced in full at App. 14a–25a.

Apfelbaum had been the subject of an earlier indictment which charged three counts of violating 18 U.S.C. § 1623. The district court dismissed that indictment however because each of the three counts failed to allege sufficiently why the allegedly false statements were *material* to the grand jury investigation. *See United States v. Slawik*, 548 F.2d 75 (3d Cir. 1977). *And see United States v. Tonelli*, 577 F.2d 194 (3d Cir. 1978). Apfelbaum was then re-indicted under Indictment No. 77–317 which

charged two counts of violating § 1623. As explained by Apfelbaum:

> The substantial difference between the first and second indictments was the allegations regarding materiality. The new indictment spelled out in more detail the subject matter of the grand jury investigation and how Mr. Apfelbaum's false statements tended to influence or impede the grand jury's investigation.

Appellant's Brief at 15. Apfelbaum therefore does not challenge on appeal the materiality of the charges contained in Indictment No. 77–317.

to the grand jury were false.[5] In addition, the Government produced evidence that Apfelbaum knew his statements were false. In proving its case in chief, the Government introduced a series of excerpts taken from the transcript of Apfelbaum's immunized grand jury testimony. The immunized testimony introduced at trial related to a range of topics relevant to the prosecution's case. These included *inter alia* (1) the degree of friendship between Apfelbaum and Brown (App. 96a–98a); (2) the circumstances surrounding Apfelbaum's discovery of, and visit to, Brown in Florida in 1976 (App. 107a, 110a, 124a–29a); (3) whether Apfelbaum and Brown discussed any loan transactions while in Florida (App. 112a); (4) whether Brown "patted down" Apfelbaum for weapons during his visit, or merely hugged him (App. 113a); (5) Apfelbaum's denial that he ever engaged in financial transactions with the Chestnut Hill dealership other than a $500 loan (App. 114a); (6) Apfelbaum's denial that he ever co-signed a loan for Brown (App. 115a); (7) a statement that Apfelbaum was introduced to one John Orem by Harry Brown (App. 116a).[6] Apfelbaum objected to the introduction of this testimony.[7]

The jury returned a verdict of guilty on both counts of false swearing. Apfelbaum was sentenced to concurrent terms of two years in prison. His appeal charges, among other alleged errors, that the fifth amendment's privilege against self-incrimination precluded the admission at trial of his immunized grand jury testimony. It is to that issue that we turn.

## II.

### A.

■ The fifth amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege "assures that a citizen is not compelled to incriminate himself by his own testimony, . . . [and] usually operates to allow a citizen to remain silent when asked a question requiring an incriminatory answer." *Kastigar v. United States,* 406 U.S. 441, 461, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972).

■ A competing constitutional interest however is that a duly constituted grand jury, "an integral part of our constitutional heritage" whose "historic office has been to provide a shield against arbitrary or oppressive action," *United States v. Mandujano,* 425 U.S. 564, 571, 96 S.Ct. 1768, 1774, 48 L.Ed.2d 212 (1976) (plurality opinion of Burger, C. J.), has the "right to every man's evidence" to fulfill its historic office. *Kastigar v. United States,* 406 U.S. at 443, 92 S.Ct. 1653; *see United States v. Mandujano,* 425 U.S. at 571, 96 S.Ct. 1768. This "right" necessarily includes the authority to compel the attendance and the testimony of witnesses. *Id.; United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561

---

5. That evidence demonstrated that Apfelbaum did indeed try to find Harry Brown in Florida in December, 1975, but could not locate him. Further, the evidence showed that on March 16, 1976, Apfelbaum told the FBI agents in an interview that he tried to locate Brown in Florida because he had loaned $10,000 to Brown in an "extremely complicated arrangement" and wanted to recover his money.

6. In its brief the Government does not dispute that the excerpts of grand jury testimony, as noted above, were introduced at trial.

7. Although Apfelbaum objected to the testimony summarized in text above, he did not object to any testimony reproduced in the indictment, nor to the admission at trial of other immunized grand jury testimony. The Government has not raised, nor has it argued, whether this failure to object constituted a waiver of any

defect in the indictment, or a waiver which would permit the entire grand jury testimony transcript to be introduced at trial, despite the partial objection. *See* Fed.R.Crim.P. 12. *See generally, Rogers v. United States,* 340 U.S. 367, 372–75, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951) ("where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details"); *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). *See also In re Neff,* 206 F.2d 149 (3d Cir. 1953). In light of the Government's failure to raise this issue, we do not address it here. *Stotler & Co., Inc. v. Amstar Corp.,* 579 F.2d 13, at 20 (3d Cir. 1978) (opinion sur petition for panel rehearing); *see Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

(1974); *Kastigar v. United States,* 406 U.S. at 443, 96 S.Ct. 1653. Yet the power to compel testimony is necessarily limited by the privilege against self-incrimination. *Id.* at 346, 92 S.Ct. 1653; *see United States v. Mandujano,* 425 U.S. at 573, 96 S.Ct. 1768; *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). Any testimony compelled in violation of that privilege may, along with its fruits, be suppressed. *United States v. Blue,* 384 U.S. 251, 255–56, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966).

Accommodation of these interests has been achieved by the use of immunity. [It] is the Government's ultimate tool for securing testimony that would otherwise be protected; . . . [w]hen granted immunity, a witness once again owes the obligation imposed upon all citizens—the duty to give testimony—*since immunity substitutes for the privilege.*

*United States v. Mandujano,* 425 U.S. at 576, 96 S.Ct. at 1776 (emphasis added).

■ A grant of "use and fruits" immunity conferred under 18 U.S.C. § 6002[8] may indeed substitute for the fifth amendment privilege, but only because its protection against the subsequent use of the compelled testimony is *coextensive* with the scope of the privilege. *Kastigar v. United States,* 406 U.S. at 453, 96 S.Ct. 1653. That is, the grant of the immunity must, by definition, afford the witness the same protection he would have received had he invoked the privilege. *See Kastigar v. United States,* 406 U.S. at 462, 96 S.Ct. 1653; *United States v. Frumento,* 552 F.2d 534, 542–43 (3d Cir. 1977) (en banc); *United States v. Kurzer,* 534 F.2d 511, 516 (2d Cir. 1976). Because a witness who has properly invoked the privilege may remain silent, *see Kastigar v. United States,* 406 U.S. at 461, 92

S.Ct. 1653, use and fruits immunity under section 6002 "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." *Id.* at 453, 92 S.Ct. at 1661 (emphasis in original); *accord, United States v. Frumento,* 552 F.2d at 543; *United States v. Hockenberry,* 474 F.2d 247 (3d Cir. 1973). Put another way, invocation of the privilege would have left Apfelbaum in a position where he would not have answered questions, truthfully or falsely, and thus such answers could not have been used against him. In the words of the Constitution, he would not have been compelled to "be a witness against himself."

■ Perjury however is a violation of an independent criminal statute, and as a practical matter, if immunity constituted a license to lie, the purpose of immunity would be defeated. Thus in order to preserve the integrity of the truth-seeking process, *see United States v. Mandujano,* 425 U.S. at 576, 96 S.Ct. 1768, 1776; a narrow exception to immunity has been carved out. That exception permits prosecution for perjurious statements made under a grant of immunity. Indeed, the Supreme Court has observed that false swearing "has no place whatever" in the "constitutional process of securing a witness' testimony." *Id.* "The Fifth Amendment privilege does not condone perjury; . . . [nor] endow the person who testifies with a license to commit perjury." *United States v. Wong,* 431 U.S. 174, 178, 97 S.Ct. 1823, 1825, 52 L.Ed.2d 231 (1977) (even the predicament of being forced to choose between an inculpatory truth or falsehood does not justify perjury), *quoting Glickstein v. United States,* 222 U.S. 139, 142, 32 S.Ct. 71, 56 L.Ed. 128 (1911); *accord, United States v. Knox,* 396 U.S. 77, 82, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) (furnishing false infor-

---

**8.** That provision reads in full:

§ 6002.   Immunity generally

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States . . . the witness may not refuse to comply with the order on the basis of his

privilege against self-incrimination; but *no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.* (Emphasis added.)

mation on a federal tax return in purported compliance with a statutory requirement is unprivileged); *see Harris v. New York,* 401 U.S. 222, 225, 226, 91 S.Ct. 643, 646, 28 L.Ed.2d 1 (1971) (voluntary confessions obtained in violation of *Miranda* may be used to impeach a testifying defendant so as not to "pervert" "the shield provided by *Miranda* . . . into a license to use perjury"); *cf. United States v. Kahan,* 415 U.S. 239, 243, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974) (testimony given by indigent in order to exercise the right to counsel may be effectively compelled and therefore protected from subsequent use, but it may not "be converted into a license for false representations"); Note, *Resolving Tensions Between Constitutional Rights: Use Immunity in Concurrent or Related Proceedings,* 76 Column.L.Rev. 674 (1976).

The sanction of the perjury statute adequately protects against a witness making a mockery of immunity. Our court has accordingly held that although a witness's false immunized testimony may indeed subject him to a prosecution for perjury, *United States v. Frumento,* 552 F.2d at 543; *United States v. Hockenberry,* 474 F.2d at 249, the use of the witness's immunized testimony is limited *only* to its use as *the basis of a perjury indictment.* As we explained in *Hockenberry,*

> [t]he immunity statute *properly permits prosecution* for perjury committed in an otherwise immunized statement *and also the introduction in evidence of so much of the statement as is essential to establishing the corpus delicti.*

474 F.2d at 249 (emphasis added).[9] Further than this, however, and consistent with the fifth amendment, the Government may not

go. *See id.; United States v. Frumento,* 552 F.2d at 543 ("[w]e reiterate our adherence to this principle; except as *the basis for a prosecution for perjury* a witness's immunized testimony may not be used against him") (emphasis added). *And see Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

█ The introduction of immunized testimony in any subsequent proceeding is thus severely restricted. Other than as the *corpus delicti* of the indictment, the Government may not use immunized testimony as substantive evidence. *United States v. Frumento,* 552 F.2d at 541–43; *United States v. Hockenberry,* 474 F.2d at 249–50. As we have previously explained: "no one [could] clai[m] that [the appellant's immunized] responses could be used in the government's case in chief against him at a subsequent trial. Clearly such use would contravene *Kastigar*." *United States v. Frumento,* 552 F.2d at 542. Nor may immunized testimony be used to impeach the testimony of the witness. *Id.* at 542–43; *United States v. Hockenberry,* 474 F.2d at 250. Again we have earlier explained:

> Clearly, if a witness had invoked his Fifth Amendment privilege, the government could have no testimony available with which it might impeach his subsequent sworn statements. Were we to permit impeachment with immunized testimony, we would then be affording the immunized witness something less than his full Fifth Amendment protection.

*United States v. Frumento,* 552 F.2d at 543.

### B.

█ At Apfelbaum's trial, the Government introduced in support of its accusa-

---

**9.** As noted, *Hockenberry,* in defining the scope of the protection afforded by the immunity statute, limited the use of subsequent testimony to that "essential to establishing the *corpus delicti.*" In so holding however, there was apparently no need for the *Hockenberry* court to define the term "*corpus delicti*" more specifically. Here, however, faced with a situation where there has been a wholesale introduction of immunized testimony at the defendant's trial, the need for defining *corpus delicti* with greater particularity becomes imperative. Thus, in the present context of a § 6002 immunity-perjury prosecution, we define *corpus de-*

*licti* to mean only the statement or statements of the defendant which the grand jury has charged to be perjurious, together with no more than that minimal testimony *essential* to place the charged falsehood into its proper context. *See United States v. Patrick,* 542 F.2d 381, 385 (7th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *United States v. DiOrio,* 150 F.2d 938, 939–40 & n. 1 (3d Cir.), *cert. denied,* 326 U.S. 771, 66 S.Ct. 175, 90 L.Ed. 465 (1945). Further, all of the testimony constituting the *corpus delicti* must be incorporated *in haec verba* in the perjury indictment.

tions a number of immunized statements made by Apfelbaum. The statements were used to prove a wide variety of substantive matters in the case-in-chief. As we have explained, however, such use cannot be reconciled with Apfelbaum's privilege against self-incrimination. Nor may such use be harmonized with the scope of immunity afforded Apfelbaum by statute, because as the Supreme Court has declared, use and fruits immunity is, and must necessarily be, co-extensive with the privilege. *Kastigar v. United States,* 406 U.S. at 453, 96 S.Ct. 1653. Thus, the introduction of immunized statements which did not form the core of, and which were not incorporated in, the indictment violated constitutional dictates, requiring the reversal of Apfelbaum's conviction.

### C.

The Government however, seeking to justify the introduction of Apfelbaum's testimony, argues that a witness's immunized grand jury testimony is nonetheless admissible at a subsequent trial for false swearing where (as is alleged here), the immunized testimony is either "directly related" to the statement in the indictment charged as false, or where the immunized testimony is "not incriminating in itself," or where the immunized statement is "in all likelihood false." *See* Government's Brief at 11–14. We disagree.

We find no support or warrant for reading the "directly related" or "not incriminating in itself" exceptions into our prior case-law. Rather, *Frumento* and *Hockenberry* unequivocally prohibit any subsequent use of truthful immunized testimony against its speaker. We of course are bound by this precedent. Even were we not so bound, we would independently reach the same conclusion.

As to the Government's assertion that Apfelbaum's grand jury testimony was "in all likelihood false," we acknowledge that if it is false it is unprotected, and therefore would subject Apfelbaum to the risk of a perjury or a false statement prosecution. However until such time as the

immunized statements are incorporated into a false swearing indictment as the *corpus delicti* of the indictment, the statements are unavailable for use by the Government at trial. Permitting the Government unrestricted use of any immunized statements whenever it supposes them to be false would necessarily vitiate the protection afforded by a grant of immunity and would effectively abrogate the immunity agreement. As the Second Circuit Court of Appeals has observed, and as we here hold, the proper remedy in the situation where the Government believes that immunized statements are false is not to disregard the immunity grant but rather is to prosecute the perjurious witness. *See United States v. Kurzer,* 534 F.2d at 518. *But cf. United States v. Tramunti,* 500 F.2d 1334 (2d Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

In short, we conclude that the three categories of immunized testimony asserted by the Government to be exceptions to the blanket protection afforded under a grant of immunity are in fact included within the ambit of the fifth amendment's protection. Thus the use of such testimony would trench upon a witness's fifth amendment privilege. *United States v. Frumento,* 552 F.2d at 541–44; *United States v. Hockenberry,* 474 F.2d at 249–50; *see Kastigar v. United States,* 406 U.S. at 453, 96 S.Ct. 1653; *cf. United States v. Berardelli,* 565 F.2d 24, 28–29 (2d Cir. 1977) (truthful immunized testimony may not be used to prove an earlier or later perjury but untruthful testimony may subject witness to prosecution for perjury); *United States v. Moss,* 562 F.2d 155, 165 (2d Cir. 1977), cert. denied, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978) ("acknowledgment by [witness] that [his immunized testimony] was perjurious rendered it usable" in subsequent proceeding); *United States v. Housand,* 550 F.2d 818, 823 (2d Cir.), cert. denied, 431 U.S. 970 (1977) (truthful, immunized testimony is not admissible to prove perjury); *United States v. Patrick,* 542 F.2d 381, 385–86 (7th Cir. 1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775

(1977) (two immunized statements may not be basis of an inconsistent declaration prosecution under 18 U.S.C. § 1623(c) because "perjury by inconsistent statements must necessarily be shown through the use of the immunized testimony"); *United States v. Kurzer,* 534 F.2d at 514–18; *United States v. Tramunti,* 500 F.2d 1334 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974) (false immunized testimony may be subsequently used for impeachment purposes and to demonstrate prior acts).[10] When applied to Apfelbaum these precepts require that his conviction be reversed, and that a new trial be granted, free from the impermissible use of protected testimony.

### III.

We conclude that there is no merit in Apfelbaum's other contentions raised on this appeal. Hence they may be disposed of summarily.

### A.

Apfelbaum urges us to go beyond reversing his conviction and a new trial. He contends that we should *dismiss* his two-count indictment for false swearing. This contention is based upon his argument that it was the same jury which not only heard his immunized testimony but which also returned his indictment for false swearing. He claims that this "same jury" procedure violated his privilege against self-incrimination because the grand jury was necessarily influenced to indict by having previously heard his protected testimony. The short answer to this contention is that the record is deficient of any proofs that the grand jury which indicted Apfelbaum impermissibly relied on his immunized testimony. *See*

*Lawn v. United States,* 355 U.S. 339, 348–49, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). In light of such a barren record, we decline Apfelbaum's invitation to address his purported constitutional violation, *see United States v. Anzalone,* 555 F.2d 317, 319–20 (2d Cir.), *aff'd on rehearing,* 560 F.2d 492 (2d Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978) (rejecting a "same jury" claim); *United States v. Camporeale,* 515 F.2d 184 (2d Cir. 1975) (same); *cf. United States v. Hinton,* 543 F.2d 1002, 1010 n. 9 (2d Cir. 1976), *cert. denied,* 429 U.S. 980, 1051, 1066, 97 S.Ct. 493, 764, 796, 50 L.Ed.2d 589, 767, 783 (1977) (upholding a "same jury" claim when the subsequent indictment charged the substantive crimes under investigation but expressly distinguishing the situation when the subsequent indictment charges false swearing), or his suggested *per se* rule that "the government should be required to use a different grand jury to indict for perjury or false declarations." Appellant's Brief at 35. *See also United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) ("an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence [citation]; or even on the basis of information obtained in violation of a defendant's fifth amendment privilege against self-incrimination"); *Lawn v. United States,* 355 U.S. at 349, 78 S.Ct. 311.

### B.

Apfelbaum also claims that the district court improperly instructed the jury as to his knowledge of the falsity of his statements because it used a *Mann* charge, *i. e.*

---

10. Our difficulty with the Second Circuit's rule as expressed in *Tramunti, Moss,* and *Berardelli* (among other cases) is that by permitting the subsequent use of arguably false, immunized testimony which is not the *corpus delicti* of a perjury indictment, the burden which the Government must carry to overcome immunity, and obtain a perjury conviction, is effectively lowered. Conviction for perjury requires that a jury find beyond a reasonable doubt that a false statement was made, and that it was

knowingly false. By contrast, the Second Circuit's rule allows the government to obtain a conviction based on the admission of immunized testimony which is not the basis of any indictment and which the *court* finds, apparently on the basis of a preponderance of the evidence, to have been false. Further, it is unclear whether the Second Circuit requires a showing of scienter before the false immunized testimony is admitted.

one which states that "unless the evidence points otherwise," a jury may infer that "one intends all the natural and probable consequences of an act." In *United States v. Garrett,* 574 F.2d 778 (3d Cir. 1978), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2265, 56 L.Ed.2d 759 (1978), our court, exercising its supervisory powers, adopted a rule disapproving use of the *Mann* charge in all trials commencing ninety days after the date of the *Garrett* decision. Apfelbaum's new trial, which we have directed, necessarily will begin after that date. Thus, on remand and at re-trial, our *Garrett* decision will be controlling.

### C.

Next, Apfelbaum argues that the use of certain evidence by the prosecutor, particularly the testimony of one John Orem, violated the rule announced by our court in *United States v. Crocker,* 568 F.2d 1049 (3d Cir. 1977). He further charges that the district court abused its discretion when it ruled that it would permit prospective character witnesses intending to testify favorably to the defendant's reputation for veracity to be cross-examined with reference to a newspaper article which implicated Apfelbaum's honesty. *See Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Fed.R.Ev. 608(b). Inasmuch as we have ordered a new trial, it would be inappropriate for us to anticipate and rule upon claims which challenge the admissibility of evidence which has not as yet been, and may never be, introduced.

We will reverse Apfelbaum's judgment of conviction, and remand for a new trial consistent with this opinion.