# UNITED STATES *v.* APFELBAUM

No. 78–972.   Argued December 3, 1979—Decided March 3, 1980

116

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, *post*, p. 132. BLACKMUN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 133.

*William C. Bryson* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann, Deputy Solicitor General Frey, Sidney M. Glazer,* and *Vincent L. Gambale.*

*Joel Harvey Slomsky* argued the cause and filed a brief for respondent.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Apfelbaum invoked his privilege against compulsory self-incrimination while being questioned before a grand jury in the Eastern District of Pennsylvania. The Government then granted him immunity in accordance with 18 U. S. C. § 6002, and he answered the questions propounded to him. He was then charged with and convicted of making false statements in the course of those answers.[1] The Court

---

[1] Title 18 U. S. C. § 1623 (a) (1976 ed., Supp. II) provides in pertinent part:

"Whoever under oath . . . in any proceeding before . . . [a] grand jury of the United States knowingly makes any false material declara-

of Appeals reversed the conviction, however, because the District Court had admitted into evidence relevant portions of respondent's grand jury testimony that had not been alleged in the indictment to constitute the *"corpus delicti"* or "core" of the false-statements offense. Because proper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely, we hold that neither the statute nor the Fifth Amendment requires that the admissibility of immunized testimony be governed by any different rules than other testimony at a trial for making false statements in violation of 18 U. S. C. § 1623 (a) (1976 ed., Supp. II). We therefore reverse the judgment of the Court of Appeals.

## I

The grand jury had been investigating alleged criminal activities in connection with an automobile dealership located in the Chestnut Hill section of Philadelphia. The investigation focused on a robbery of $175,000 in cash that occurred at the dealership on April 16, 1975, and on allegations that two officers of the dealership staged the robbery in order to repay loan-shark debts.[2] The grand jury also heard testimony that the officers were making extortionate extensions of credit through the Chestnut Hill Lincoln-Mercury dealership.

In 1976, respondent Apfelbaum, then an administrative assistant to the District Attorney in Philadelphia, was called to testify because it was thought likely that he was an aider or abettor or an accessory after the fact to the allegedly staged robbery. When the grand jury first sought to question him about his relationship with the two dealership officials sus-

tion . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

[2] One of the officers was subsequently convicted of collecting extensions of credit by extortionate means in violation of 18 U. S. C. § 894, mail fraud in violation of 18 U. S. C. § 1341, racketeering in violation of 18 U. S. C. § 1962, and conspiracy in violation of 18 U. S. C. § 371.

pected of the staged robbery, he claimed his Fifth Amendment privilege against compulsory self-incrimination and refused to testify. The District Judge entered an order pursuant to 18 U. S. C. § 6002 granting him immunity and compelling him to testify.[3] Respondent ultimately complied with this order to testify.[4]

During the course of his grand jury testimony, respondent made two series of statements that served as the basis for his subsequent indictment and conviction for false swearing. The first series was made in response to questions concerning whether respondent had attempted to locate Harry Brown, one of the two dealership officials, while on a "fishing trip" in Ft. Lauderdale, Fla., during the month of December 1975. Respondent testified that he was "positive" he had not attempted to locate Brown, who was also apparently in the Ft. Lauderdale area at the time. In a second series of statements, respondent denied that he had told FBI agents that he had lent $10,000 to Brown. The grand jury later indicted respond-

---

[3] Title 18 U. S. C. § 6002 provides:

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

"(1) a court or grand jury of the United States,

"(2) an agency of the United States, or

"(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

"and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

[4] After the issuance of the immunity order, respondent had still refused to testify before the grand jury. He agreed to testify after being held in civil contempt under 28 U. S. C. § 1826 and confined for six days.

ent pursuant to 18 U. S. C. § 1623 (a) (1976 ed., Supp. II) for making these statements, charging that the two series of statements were false and that respondent knew they were false.

At trial, the Government introduced into evidence portions of respondent's grand jury testimony in order to put the charged statements in context and to show that respondent knew they were false. The excerpts concerned respondent's relationship with Brown, his 1976 trip to Florida to visit Brown, the discussions he had with Brown on that occasion, and his denial that he had financial dealings with the automobile dealership in Philadelphia or had cosigned a loan for Brown. Respondent objected to the use of all the immunized testimony except the portions charged in the indictment as false. The District Court overruled the objection and admitted the excerpts into evidence on the ground that they were relevant to prove that respondent had knowingly made the charged false statements. The jury found respondent guilty on both counts of the indictment.

The Court of Appeals for the Third Circuit reversed, holding that because the immunized testimony did not constitute "the *corpus delicti* or core of a defendant's false swearing indictment" it could not be introduced. 584 F. 2d 1264, 1265 (1978). We granted certiorari because of the importance of the issue and because of a difference in approach to it among the Courts of Appeals.[5] 440 U. S. 957 (1979).

---

[5] The Seventh Circuit agrees with the Court of Appeals below that the Government may introduce into evidence so much of the witness' testimony as is essential to establish the *corpus delicti* of the offense of perjury. *United States* v. *Patrick*, 542 F. 2d 381, 385 (1976). The Second and Tenth Circuits have held that false immunized testimony is admissible, but truthful immunized testimony is not, in a subsequent prosecution for perjury. *United States* v. *Dunn*, 577 F. 2d 119, 125–126 (CA10 1978), rev'd on other grounds, 442 U. S. 100 (1979); *United States* v. *Berardelli*, 565 F. 2d 24, 28 (CA2 1977); *United States* v. *Moss*, 562 F. 2d 155, 165 (CA2 1977), cert. denied, 435 U. S. 914 (1978); *United States* v. *Housand*,

The differing views that this question has elicited from the Courts of Appeals are not surprising, because there are considered statements in one line of cases from this Court, and both statements and actual holdings in another line of cases, that as a matter of strict and literal reading cannot be wholly reconciled.[6] Though most of the decisions of the Courts of

550 F. 2d 818, 822 (CA2 1977); *United States* v. *Kurzer,* 534 F. 2d 511, 518 (CA2 1976). The Sixth and Eighth Circuits have held that immunized testimony may be used for any purpose in such a prosecution. *Daniels* v. *United States,* 196 F. 459, 462–463 (CA6 1912); *Edelstein* v. *United States,* 149 F. 636, 642–644 (CA8 1906).

[6] A principal reason for this divergence in approach originates in the statement in *Counselman* v. *Hitchcock,* 142 U. S. 547, 585 (1892), that an immunity statute "cannot abridge a constitutional privilege, and that it cannot replace or supply one, at least unless it is so broad as to have the same extent in scope and effect." This language was reiterated only last Term in *New Jersey* v. *Portash,* 440 U. S. 450, 456–457 (1979).

As discussed in Part III, *infra,* strictly speaking even a "transactional" immunity statute, to say nothing of a "use" immunity statute, does not conform to this definition: The mere grant of immunity and consequent compulsion to testify places a witness asserting his Fifth Amendment privilege in the dilemma of having to decide whether to answer the questions truthfully or falsely, a dilemma he never would have faced had he simply been permitted to remain silent upon the invocation of his privilege. Yet properly drawn immunity statutes have long been recognized as valid in this country. *Infra,* at 125. And it is likewise well established that one may be prosecuted for making false statements while giving immunized testimony. *Infra,* at 126–127.

A source of further difficulty for the Courts of Appeals is language from our recent decisions that, if taken literally, would preclude the introduction of immunized testimony even for the purpose of establishing the "*corpus delicti*" or core of the perjury offense. In *Kastigar* v. *United States,* 406 U. S. 441, 453 (1972), in which we upheld the constitutionality of this immunity statute against a challenge that it did not provide protection coextensive with the Fifth Amendment, we said that it "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." And in *New Jersey* v. *Portash, supra,* at 459, we stated that under the Fifth and Fourteenth Amendments "a defendant's compelled statements . . . may not be put to any testimonial use whatever against him in a criminal trial. '. . . [A]*ny* criminal trial use against a

Appeals turn on the interaction between perjury and immunity statutes enacted by Congress and the privilege against compulsory self-incrimination conferred by the Fifth Amendment to the United States Constitution, it is of course our first duty to decide whether the statute relied upon in this case to sustain the conviction of respondent may properly be interpreted to do so. We turn now to decision of that question.

## II

Did Congress intend the federal immunity statute, 18 U. S. C. § 6002, to limit the use of a witness' immunized grand jury testimony in a subsequent prosecution of the witness for false statements made at the grand jury proceeding? Respondent contends that while § 6002 permits the use of a witness' false statements in a prosecution for perjury or for making false declarations, it establishes an absolute prohibition against the use of truthful immunized testimony in such prosecutions. But this contention is wholly at odds with the explicit language of the statute, and finds no support even in its legislative history.

It is a well-established principle of statutory construction that absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language. Here 18 U. S. C. § 6002 provides that when a witness is compelled to testify over his claim of a Fifth Amendment privilege, "no testimony or other information compelled under the order (or any information directly or indirectly derived from

---

defendant of his *involuntary* statement is a denial of due process of law.'" (Emphasis in original.)

Doubtless as a result of these divergent holdings and statements none of the Court of Appeals decisions referred to in footnote 5, *supra*, holds that *false* immunized testimony may not form the basis for a prosecution for perjury or false swearing, but they differ as to how much of the relevant immunized testimony other than that asserted by the Government to be false may be introduced in such a prosecution.

such testimony or other information) may be used against the witness in any criminal case, *except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."* (Emphasis added.) The statute thus makes no distinction between truthful and untruthful statements made during the course of the immunized testimony. Rather, it creates a blanket exemption from the bar against the use of immunized testimony in cases in which the witness is subsequently prosecuted for making false statements.

The legislative history of § 6002 shows that Congress intended the perjury and false-declarations exception to be interpreted as broadly as constitutionally permissible. The present statute was enacted as a part of the Organized Crime Control Act of 1970,[7] after a re-examination of the broad transactional immunity statute enacted in response to this Court's decision in *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892). See *Kastigar* v. *United States,* 406 U. S. 441, 452, and n. 36 (1972). Its design was not only to bring about uniformity in the operation of immunity grants within the federal system,[8] but also to restrict the grant of immunity to that required by the United States Constitution. Thus, the statute derives from a 1969 report of the National Commission on the Reform of the Federal Criminal Laws, which proposed a general use immunity statute under which "the immunity conferred would

---

[7] Pub. L. 91–452, § 201 (a), 84 Stat. 926. The purpose of the Act was "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." 84 Stat. 923.

[8] See, *e. g.,* Measures Relating to Organized Crime, Hearings on S. 30, etc., before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 282–284 (1969) (remarks of Representative Poff and Senator McClellan). At the time the new statute was being considered, there were more than 50 separate federal immunity statutes. *Id.,* at 282.

be confined to the scope required by the Fifth Amendment." [9]
And as stated in both the Senate and House Reports on the
proposed legislation:

"This statutory immunity is intended to be as broad as,
but no broader than, the privilege against self-incrimina-
tion. . . . It is designed to reflect the use-restriction
immunity concept of *Murphy* v. *Waterfront Commission,*
378 U. S. 52 (1964) rather [than] the transaction immu-
nity concept of *Counselman* v. *Hitchcock,* 142 U. S. 547
(1892)." [10]

In light of the language and legislative history of § 6002, the
conclusion is inescapable that Congress intended to permit
the use of both truthful and false statements made during the
course of immunized testimony if such use was not prohibited
by the Fifth Amendment.

### III

The limitation placed on the use of relevant evidence by the
Court of Appeals may be justified, then, only if required by
the Fifth Amendment. Respondent contends that his convic-
tion was properly reversed because under the Fifth Amend-
ment his truthful immunized statements were inadmissible
at his perjury trial, and the Government never met its burden
of showing that the immunized statements it introduced into
evidence were not truthful. The Court of Appeals, as noted

---

[9] Second Interim Report of the National Commission on Reform of
Federal Criminal Laws, Mar. 17, 1969, reproduced in Hearings on S. 30,
*supra* n. 8, at 292. See also *id.,* at 15, 326; National Commission on
Reform of Federal Criminal Laws, Working Papers 1405 (1970).

[10] S. Rep. No. 91–617, p. 145 (1969); H. R. Rep. No. 91–1549 p. 42
(1970). Representative Poff, the bill's chief sponsor in the House, quoted
MR. JUSTICE WHITE's observation in *Murphy* v. *Waterfront Comm'n,* 378
U. S. 52, 107 (1964), that " '[i]mmunity must be as broad as, but not
harmfully and wastefully broader than, the privilege against self-incrimi-
nation.' " 116 Cong. Rec. 35291 (1970). We express no opinion as to
the possible intimation in the Reports that the Fifth Amendment would
have prohibited an immunity statute any broader than § 6002.

above, concluded that the Fifth Amendment prohibited the use of all immunized testimony except the *"corpus delicti"* or "core" of the false swearing indictment.

In reaching its conclusion, the Court of Appeals initially observed that a grant of immunity must be coextensive with the Fifth Amendment. *Kastigar* v. *United States, supra,* at 449. It then reasoned that had respondent not been granted immunity, he would have been entitled under the Fifth Amendment to remain silent. And if he had remained silent, he would not have answered any questions, truthfully or falsely. There consequently would have been no testimony whatsoever to use against him. A prosecution for perjury committed at the immunized proceeding, the Court of Appeals continued, must be permitted because "as a practical matter, if immunity constituted a license to lie, the purpose of immunity would be defeated." Such a prosecution is but a "narrow exception" carved out to preserve the integrity of the truth-seeking process. But the subsequent use of statements made at the immunized proceeding, other than those alleged in the indictment to be false, is impermissible because the introduction of such statements cannot be reconciled with the privilege against self-incrimination. 584 F. 2d, at 1269–1271.

A

There is more than one flaw in this reasoning. Initially, it presumes that in order for a grant of immunity to be "coextensive with the Fifth Amendment privilege," the witness must be treated as if he had remained silent. This presumption focuses on the *effect* of the assertion of the Fifth Amendment privilege, rather than on the *protection* the privilege is designed to confer. In so doing, it calls into question the constitutionality of all immunity statutes, including "transactional" immunity statutes as well as "use" immunity statutes such as § 6002. Such grants of immunity would not provide a full and complete substitute for a witness' silence because, for example, they do not bar the use of the witness' state-

ments in civil proceedings. Indeed, they fail to prevent the use of such statements for any purpose that might cause detriment to the witness other than that resulting from subsequent criminal prosecution.

This Court has never held, however, that the Fifth Amendment requires immunity statutes to preclude all uses of immunized testimony. Such a requirement would be inconsistent with the principle that the privilege does not extend to consequences of a noncriminal nature, such as threats of liability in civil suits, disgrace in the community, or the loss of employment. See, *e. g., Brown* v. *Walker,* 161 U. S. 591, 605–606 (1896); *Smith* v. *United States,* 337 U. S. 137, 147 (1949); *Ullmann* v. *United States,* 350 U. S. 422, 430–431 (1956); *Uniformed Sanitation Men Assn.* v. *Commissioner of Sanitation,* 392 U. S. 280, 284–285 (1968); *Gardner* v. *Broderick,* 392 U. S. 273, 279 (1968).

And this Court has repeatedly recognized the validity of immunity statutes. *Kastigar* v. *United States,* 406 U. S., at 449, acknowledged that Congress included immunity statutes in many of the regulatory measures adopted in the first half of this century, and that at the time of the enactment of 18 U. S. C. § 6002, the statute under which this prosecution was brought, there were in force over 50 federal immunity statutes as well as similar laws in every State of the Union. 406 U. S., at 447. This Court in *Ullmann* v. *United States, supra,* stated that such statutes have "become part of our constitutional fabric." 350 U. S., at 438. And the validity of such statutes may be traced in our decisions at least as far back as *Brown* v. *Walker, supra.*

These cases also establish that a strict and literal reading of language in cases such as *Counselman* v. *Hitchcock,* 142 U. S., at 585—that an immunity statute "cannot abridge a constitutional privilege, and that it cannot replace or supply one, at least unless it is so broad as to have the same extent in scope and effect"—does not require the sort of "but for" analysis used by the Court of Appeals in order to enable it to survive

attack as being violative of the privilege against compulsory self-incrimination. Indeed, in *Brown* v. *Walker, supra,* at 600, this Court stated that "[t]he danger of extending the principle announced in *Counselman* v. *Hitchcock* is that the privilege may be put forward for a sentimental reason, or for a purely fanciful protection of the witness against an imaginary danger, and for the real purpose of securing immunity to some third person, who is interested in concealing the facts to which he would testify." And in *Kastigar* v. *United States,* we concluded that "[t]he broad language in *Counselman* relied upon by petitioners was unnecessary to the Court's decision, and cannot be considered binding authority." 406 U. S., at 454–455. *Kastigar* also expressly declined a request by the petitioner to reconsider and overrule *Brown* v. *Walker, supra,* and *Ullmann* v. *United States, supra,* and went on to expressly reaffirm the validity of those decisions.

The reasoning of the Court of Appeals is also internally inconsistent in that logically it would not permit a prosecution for perjury or false swearing committed during the course of the immunized testimony. If a witness must be treated as if he had remained silent, the mere requirement that he answer questions, thereby subjecting himself to the possibility of being subsequently prosecuted for perjury or false swearing, places him in a position that is substantially different from that he would have been in had he been permitted to remain silent.

All of the Courts of Appeals, however, have recognized that the provision in 18 U. S. C. § 6002 allowing prosecutions for perjury in answering questions following a grant of immunity does not violate the Fifth Amendment privilege against compulsory self-incrimination. And we ourselves have repeatedly held that perjury prosecutions are permissible for false answers to questions following the grant of immunity. See, *e. g., United States* v. *Wong,* 431 U. S. 174 (1977); *United States* v. *Mandujano,* 425 U. S. 564 (1976) (plurality opinion); *id.,* at 584–585 (BRENNAN, J., concurring in judgment);

*id.,* at 609 (STEWART, J., joined by BLACKMUN, J., concurring in judgment).

It is therefore analytically incorrect to equate the benefits of remaining silent as a result of invocation of the Fifth Amendment privilege with the protections conferred by the privilege—protections that may be invoked with respect to matters that pose substantial and real hazards of subjecting a witness to criminal liability at the time he asserts the privilege. For a grant of immunity to provide protection "coextensive" with that of the Fifth Amendment, it need not treat the witness as if he had remained silent. Such a conclusion, as noted above, is belied by the fact that immunity statutes and prosecutions for perjury committed during the course of immunized testimony are permissible at all.

## B

The principle that the Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury has frequently been cited without any elaboration as to its underlying rationale. See, *e. g., Bryson* v. *United States,* 396 U. S. 64, 72 (1969); *United States* v. *Knox,* 396 U. S. 77, 82 (1969). Its doctrinal foundation, as relied on in both *Wong* and *Mandujano,* is traceable to *Glickstein* v. *United States,* 222 U. S. 139, 142 (1911). *Glickstein* stated that the Fifth Amendment "does not endow the person who testifies with a license to commit perjury," *ibid.,* and that statement has been so often repeated in our cases as to be firmly established constitutional law. But just as we have refused to read literally the broad dicta of *Counselman, supra,* we are likewise unwilling to decide this case solely upon an epigram contained in *Glickstein, supra.* Thus, even if, as the Court of Appeals said, a perjury prosecution is but a "narrow exception" to the principle that a witness should be treated as if he had remained silent, it does not follow that the Court of Appeals was correct in its view of the question before us now.

Perjury prosecutions based on immunized testimony, even if they be but a "narrow exception" to the principle that a witness should be treated as if he had remained silent after invoking the Fifth Amendment privilege, *are* permitted by our cases. And so long as they are, there is no principle or decision that limits the admissibility of evidence in a manner peculiar only to them. To so hold would not be an exercise in the balancing of competing constitutional rights, but in a comparison of apples and oranges.[11] For even if both truthful and untruthful testimony from the immunized proceeding are admissible in a subsequent perjury prosecution, the exception surely would still be properly regarded as "narrow," once it is recognized that the testimony remains inadmissible in all prosecutions for offenses committed prior to the grant of immunity that would have permitted the witness to invoke his Fifth Amendment privilege absent the grant.

While the application of the Fifth Amendment privilege to various types of claims has changed in some respects over the past three decades, the basic test reaffirmed in each case has been the same.

> "The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination. *Rogers* v. *United States,* 340 U. S. 367, 374; *Brown* v. *Walker,* 161 U. S. 591, 600." *Marchetti* v. *United States,* 390 U. S. 39, 53 (1968).

*Marchetti,* which overruled earlier decisions of this Court in *United States* v. *Kahriger,* 345 U. S. 22 (1953), and *Lewis* v. *United States,* 348 U. S. 419 (1955), invalidated the fed-

---

[11] Thus, the Court of Appeals' position is basically a halfway house that does not withstand logical analysis. If the rule is that a witness who is granted immunity may be placed in no worse a position than if he had been permitted to remain silent, the principle that the Fifth Amendment does not protect false statements serves merely as a piece of a legal mosaic justified solely by *stare decisis,* rather than as part of a doctrinally consistent view of that Amendment.

eral wagering statutes at issue in *Kahriger* and *Lewis* on the ground that they contravened the petitioner's Fifth Amendment right against compulsory self-incrimination. The practical effect of the requirements of those statutes was to compel petitioner, a professional gambler engaged in ongoing gambling activities that he had commenced and was likely to continue, to choose between openly exposing himself as acting in violation of state and federal gambling laws and risking federal prosecution for tax avoidance.[12] The Court held that petitioner was entitled to assert his Fifth Amendment privilege in these circumstances. But it also observed that "prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination." 390 U. S., at 54. Thus, although *Marchetti* rejected "the rigid chronological distinction adopted in *Kahriger* and *Lewis*," *id.*, at 53, that distinction does not aid respondent here.

In *United States* v. *Freed*, 401 U. S. 601 (1971), this Court rejected the argument that a registration requirement of the National Firearms Act violated the Fifth Amendment because the information disclosed could be used in connection with offenses that the transferee of the firearm might commit in the future. In so doing, the Court stated:

"Appellees' argument assumes the existence of a periphery of the Self-Incrimination Clause which protects a

---

[12] Thus, the Court observed:

"Petitioner was confronted by a comprehensive system of federal and state prohibitions against wagering activities; he was required, on pain of criminal prosecution, to provide information which he might reasonably suppose would be available to prosecuting authorities, and which would surely prove a significant 'link in a chain' of evidence tending to establish his guilt." 390 U. S., at 48.

And "[e]very aspect of petitioner's wagering activities," the Court continued, "subjected him to possible state or federal prosecution," and the "[i]nformation obtained as a consequence of the federal wagering tax laws is readily available to assist the efforts of state and federal authorities to enforce these penalties." *Id.*, at 47.

person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation." *Id.*, at 606–607.

And MR. JUSTICE BRENNAN in his concurring opinion added:

"I agree with the Court that the Self-Incrimination Clause of the Fifth Amendment does not require that immunity be given as to the use of such information in connection with crimes that the transferee might possibly commit in the future with the registered firearm." *Id.*, at 611.

In light of these decisions, we conclude that the Fifth Amendment does not prevent the use of respondent's immunized testimony at his trial for false swearing because, at the time he was granted immunity, the privilege would not have protected him against false testimony that he later might decide to give. Respondent's assertion of his Fifth Amendment privilege arose from his claim that the questions relating to his connection with the Chestnut Hill auto dealership would tend to incriminate him. The Government consequently granted him "use" immunity under § 6002, which prevents the use and derivative use of his testimony with respect to any subsequent criminal case except prosecutions for perjury and false swearing offenses, in exchange for his compelled testimony.

The Government has kept its part of the bargain; this is a perjury prosecution and not any other kind of criminal prosecution. The Court of Appeals agreed that such a prosecution might be maintained, but as noted above severely limited the admissibility of immunized testimony to prove the Government's case. We believe that it could not be fairly said that respondent, at the time he asserted his privilege and was consequently granted immunity, was confronted with more than a "trifling or imaginary" hazard of compelled self-incrimination as a result of the possibility that he might com-

mit perjury during the course of his immunized testimony. In *United States* v. *Bryan*, 339 U. S. 323 (1950), we held that an immunity statute that provided that "[n]o testimony given by a witness before . . . any committee of either House . . . shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony," did not bar the use at respondent's trial for willful default of the testimony given by her before a congressional committee. In so holding, we stated that "[t]here is, in our jurisprudence, no doctrine of 'anticipatory contempt.'" *Id.,* at 341.

We hold here that in our jurisprudence there likewise is no doctrine of "anticipatory perjury." In the criminal law, both a culpable *mens rea* and a criminal *actus reus* are generally required for an offense to occur.[13] Similarly, a future intention to commit perjury or to make false statements if granted immunity because of a claim of compulsory self-incrimination is not by itself sufficient to create a "substantial and 'real'" hazard that permits invocation of the Fifth Amendment. *Brown* v. *Walker,* 161 U. S. 591 (1896); *Rogers* v. *United States,* 340 U. S. 367 (1951). Therefore, neither the immunity statute nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements, so long as that testimony conforms to otherwise applicable rules of evidence. The exception of a perjury prosecution from the prohibition against the use of immunized testimony may be a narrow

---

[13] As recognized by one commentator, Shakespeare's lines here express sound legal doctrine:
"His acts did not o'ertake his bad intent;
And must be buried but as an intent
That perish'd by the way: thoughts are no subjects,
Intents but merely thoughts."
Measure for Measure, Act V, Scene 1; G. Williams, Criminal Law, The General Part 1 (2d ed. 1961).

one, but it is also a complete one. The Court of Appeals having held otherwise, its judgment is accordingly

*Reversed.*

MR. JUSTICE BRENNAN, concurring in the judgment.

The Fifth Amendment guarantees the right to be free from compulsory self-incrimination. It permits an individual to refuse to answer questions; but it does not give him the right to answer falsely. *United States* v. *Mandujano,* 425 U. S. 564, 584–585 (1976) (BRENNAN, J., concurring in judgment); *United States* v. *Wong,* 431 U. S. 174 (1977). When the Government compels testimony via a grant of immunity it is constitutionally required to place the victim in a position similar to the one he would have occupied had he exercised his Fifth Amendment privilege. The scope of immunity, in other words, must be "coextensive with the scope of the privilege." *Kastigar* v. *United States,* 406 U. S. 441, 449 (1972). This does not, however, bar a prosecution for perjury committed in the course of immunized testimony, even though such a prosecution will obviously place the witness in a worse position than he would have been in had he invoked the privilege. The perjury exception seems to have two sources. First, it stems from the aforementioned fact that prior to the immunity grant the witness had no Fifth Amendment right to answer falsely, and, second, it flows from the simple reality that affording the witness a right to lie with impunity would render the entire immunity transaction futile.

Because I think it follows from the logic and exigencies of the perjury exception that the Government should be permitted to introduce other portions of the immunized testimony to prove elements of the offense of perjury, I concur in the judgment reversing the decision of the Court of Appeals for the Third Circuit. And because I find this ground adequate to decide the present case I see no reason to explore the terrain which the majority probes via what is in one sense dicta.

More particularly, (1) I do not think that the present result compels the conclusion that there are no special constitutional constraints on the use to which immunized testimony may be put in a perjury prosecution, and (2) I am by no means persuaded that the result here would be correct were this a prosecution for false swearing occurring after the immunized testimony rather than in the course of it.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE MARSHALL joins, concurring in the judgment.

I do not join the Court's opinion. I agree, however, that the Court of Appeals too narrowly confined the use of immunized testimony in the prosecution of respondent for giving false testimony. I do not fully subscribe to the Court's holding that "neither the statute nor the Fifth Amendment requires that the admissibility of immunized testimony be governed by any different rules than other testimony at a trial for making false statements." *Ante,* at 117. And I do not fully agree with the Court's conclusion that the practical effect of asserting the privilege against self-incrimination is an unimportant factor in determining whether a grant of immunity is coextensive with Fifth Amendment protection. See *ante,* at 125. I therefore concur only in the judgment.

The Court's statement of its holding troubles me primarily for two reasons. First, it apparently makes no distinction between a prosecution for false testimony given under a grant of immunity and a prosecution for false testimony in other contexts. This case concerns the use of immunized testimony to prove that respondent made contemporaneous false statements. There is no occasion to determine whether the immunized testimony could have been used to prove perjury or false statements occurring at some other time. The Court thus states its holding in language that is broader than necessary. At the moment, I am not prepared to go so far.

Second, I am not sure I agree that the use of immunized

testimony in perjury prosecutions requires no special analysis with respect to the usual rules of evidence. How the testimony is to be used may well be an important factor in determining whether the protection against self-incrimination has been honored. For example, a witness' truthful admission of prior perjury conceivably might be protected from use even though independent evidence of such a prior similar crime were admissible. Again, I would prefer to await further developments before deciding this question.

Perhaps a more fundamental reservation about the Court's opinion concerns its attempted distinction between, on the one hand, the protection afforded by the privilege against self-incrimination and, on the other, the effect of the invocation of the privilege. Since the privilege itself is *defined* in terms of the incriminating effect of truthful testimony, it does not seem irrational to weigh alternative methods for protecting this constitutional right in terms of their effect as well. As the Court demonstrates, *ante,* at 124–125, a grant of immunity may be a constitutionally adequate response to invocation of the privilege without perfectly replicating the effect of total silence, at least where a civil use of the testimony is concerned. But that observation, for me, does not obviate the relevance of a comparison between silence and immunity in determining whether the protection afforded by the latter ensures that the privilege against self-incrimination has been properly preserved. Whether as a matter of logic, history, or experience, it does not follow that an analogy is robbed of all force merely because it is not always or singly controlling in every imaginable circumstance. Compare *Kastigar* v. *United States,* 406 U. S. 441, 449 (1972), and *Ullmann* v. *United States,* 350 U. S. 422, 438 (1956), with *ante,* at 127–128. See also O. Holmes, The Common Law 1 (1881). The Court's cases long have regarded the right to remain silent in the face of compelled incrimination as a touchstone for Fifth Amendment protection. See *Kastigar* v. *United States,* 406 U. S., at 461; *Brown* v. *Walker,* 161 U. S.

591, 596–597 (1896). The Court may be prepared now to deviate from that course; I am not so prepared.

Nonetheless, I remain convinced that "[t]he Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury." *United States* v. *Mandujano*, 425 U. S. 564, 609 (1976) (opinion concurring in judgment). The privilege operates only to protect the witness from compulsion of *truthful* testimony of an incriminating nature. Perjury or the making of. false statements under a grant of immunity thus violates a basic assumption upon which the privilege and hence the immunity depend. Preserving the integrity of the immunity "bargain," *ante*, at 130, by allowing the use of immunized testimony for the limited purpose of proving that the terms of immunity have been criminally breached, is an integral part of the "rational accommodation between the imperatives of the privilege and the legitimate demands of government" upon which the entire theory of immunity rests. *Kastigar* v. *United States,* 406 U. S., at 446. See *Glickstein* v. *United States,* 222 U. S. 139, 141 (1911); *United States* v. *Tramunti,* 500 F. 2d 1334, 1342 (CA2), cert. denied, 419 U. S. 1079 (1974). Prosecutions for perjury or making false statements differ in this respect from all other instances in which, but for the grant of immunity, the witness' testimony might be used. It is for this reason, in my view, that they have been regarded as "a 'narrow exception' to the principle that a witness should be treated as if he had remained silent after invoking the Fifth Amendment privilege." *Ante,* at 128. Since I find this ground sufficient to dispose of the present case, I need not decide at this juncture whether I fully agree with what seem to be the broader implications of the Court's analysis and opinion.