**STATE of Alaska, Petitioner,**

v.

**Tor HOFSETH, Respondent.**

**No. A–3416.**

Court of Appeals of Alaska.

Dec. 6, 1991.

Clarified on Rehearing Feb. 6, 1992.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for petitioner.

Suzanne Weller, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for respondent.

Before BRYNER, C.J., COATS, J., and SAVELL, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Tor Hofseth was charged with insurance fraud, second-degree theft, making a false report, removal of identification from a vehicle, and possession of a vehicle with altered identification numbers. The charges stemmed from Hofseth's alleged collection of insurance payments on a DeLorean automobile that was falsely reported stolen. After being charged, Hofseth moved to suppress the DeLorean, alleging that it was seized in violation of his right against self-incrimination. Superior Court Judge Peter A. Michalski granted the motion. The state then petitioned for review. We granted the state's petition because the superior court's order involved "an important question of law upon which there is a substantial ground for difference of opinion...." Appellate Rule 402(b)(2). We now affirm the superior court's order of suppression.

## FACTS

Hofseth was arrested on a charge of criminal mischief in January of 1988. At his arraignment, he requested court-appointed counsel and was referred to the office of Pre–Trial Services (PTS) for a routine interview to determine his eligibility for public representation.

At the PTS office, Hofseth made only a perfunctory effort to fill out the standard financial disclosure form. He disclosed no assets or income and claimed to be unemployed. Suzanne Rogers of PTS interviewed Hofseth. Hofseth indicated that he lived with his former spouse, Kaarina Brodsky, who continued to support him, in return for which Hofseth cared for their young child and performed work on a house that Brodsky was building on her property. Hofseth refused to provide Rogers with information concerning Brodsky's financial situation, claiming that, because he and Brodsky had been divorced, he had no legal right to any of her property.

Investigative notes prepared by Rogers following her interview with Hofseth indicate that Rogers checked with the Department of Motor Vehicles under Hofseth's and Brodsky's names. She learned that Hofseth was listed as owning a 1981 Toyota pickup truck and that a 1984 Mustang was registered to Hofseth and Brodsky jointly. Brodsky was shown as owning a 1980 Thunderbird, a 1972 Toyota station wagon, and a 1981 DeLorean. According to DMV records, the DeLorean had been registered to Hofseth before January, 1985.

Rogers' investigative notes further indicated that Rogers contacted a personal reference listed on Hofseth's financial disclosure statement and learned that Hofseth had recently performed a small remodeling job, for which he had received $600.

Based on Hofseth's lack of cooperation and the information she learned through her independent investigation, Rogers suspected that Hofseth might be misrepresenting his financial status. She recommended that appointed counsel be denied, noting that Hofseth "could then be required to further document his statements and could provide his ex-wife's financial information." Acting on Rogers' recommendation, District Court Judge Ralph Stemp denied Hofseth's request for court-appointed counsel on January 7, 1988.

On January 12, 1988, Hofseth appeared without counsel for a hearing before Dis-

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

trict Court Judge William Fuld. Judge Fuld indicated that he would be willing to reconsider the denial of court-appointed counsel if Hofseth agreed to answer questions under oath about his financial condition. Hofseth agreed.

In response to the court's questions, Hofseth testified that he was living with his ex-wife, Brodsky, who supported him. Hofseth denied owning any vehicles or property and stated that he was uninsured. He acknowledged that Brodsky was employed and that she owned a lot, upon which Hofseth was helping her build a house. Hofseth assured the court, however, that all of the property was in Brodsky's name. Among other property of Brodsky's that Hofseth described was a 1981 DeLorean automobile.

At the conclusion of the hearing, Judge Fuld found Hofseth eligible for court-appointed counsel and directed the public defender agency to represent him. The case, however, was eventually dismissed.

Several months later, in April of 1988, Hofseth appeared in court on a new municipal misdemeanor charge. He requested court-appointed counsel, again informing PTS that he was unemployed, had no assets, and was living with his ex-wife. The court appointed counsel. A subsequent check of Hofseth's records by PTS, however, revealed that he and Brodsky, after an initial marriage and divorce, had been remarried in 1985. No record of divorce or dissolution after the remarriage existed. After being provided with this information by PTS, the district court scheduled a hearing to determine whether Hofseth actually qualified for appointed counsel, but the hearing was canceled because Hofseth's criminal charges were dismissed.

Evidently prompted by these developments, Suzanne Rogers spoke with Judge Fuld in the latter part of May or early June, 1988, and on June 7 she wrote the judge a memorandum indicating that Hofseth had apparently perjured himself in applying for court-appointed counsel. Rogers' memorandum recounted the chronology of events and described the results of her investigation into Hofseth's and Brodsky's assets. Rogers specifically disclosed that Brodsky was the registered owner of a 1981 DeLorean that Hofseth transferred to her eight days after their remarriage. Rogers went on to indicate that, in 1987, the DeLorean was reported stolen and that Brodsky received an insurance payment of $22,000 as a result of the theft.

On the basis of Rogers' memo, Judge Fuld wrote to the district attorney's office in Anchorage on July 20, 1988, requesting the state to consider criminal charges against Hofseth. Judge Fuld attached a copy of Rogers' June 7 memorandum, commenting that "this appears to be an aggravated case of perjury."

Following up on Judge Fuld's letter, the state filed a request for release to the district attorney's office of the full PTS file on Hofseth. Judge Fuld granted the request in December of 1988. Thereafter, the district attorney's office asked the Alaska State Troopers to determine what motor vehicles were in Hofseth's and Brodsky's possession. The troopers' investigation confirmed the presence of a DeLorean parked on Brodsky's property.

Knowing that Brodsky had reported a DeLorean stolen and had collected an insurance claim for the theft, the troopers obtained a warrant to seize the car. Upon executing the warrant, they discovered that the DeLorean was the same automobile previously reported stolen. Further investigation revealed that, after the DeLorean was reported stolen, Hofseth had purchased a DeLorean in Utah that had been wrecked in an accident. The vehicle identification numbers from that car had then apparently been installed on the DeLorean that Brodsky had reported stolen in Anchorage. Based on the foregoing information, the state brought the current charges against Hofseth.

## SUPERIOR COURT PROCEEDINGS

After the charges in this case were filed, Hofseth moved to suppress the DeLorean, claiming that its seizure had resulted from the district court's release of his PTS files. He contended that this information was

confidential and that its disclosure violated his constitutional privilege against self-incrimination and his rights under Alaska's Public Defender Act, AS 18.85.010–180.

Hofseth relied particularly on AS 18.85.120, which establishes procedures for determining indigency for purposes of public representation. In relevant part, AS 18.85.120 provides:

> (b) In determining whether a person is indigent and in determining the extent of the person's inability to pay, the court shall consider such factors as income, property owned, outstanding obligations, and the number and ages of dependents. Release on bail does not preclude a finding that a person is indigent. In each case, the person, subject to the penalties for perjury, shall certify under oath, and in writing or by other record, material factors relative to the person's ability to pay that the court prescribes.
>
> . . . .
>
> (d) As a condition of receiving services under this chapter, a person shall affirm indigency under oath to the court and execute a general waiver authorizing the release to the court of income information regarding any income source the person has had for a period of three years immediately preceding the person's first court appearance in connection with each cause. At the conclusion of all services by the public defender to the person, the court shall upon request release to the attorney general all information received under this subsection except information that might incriminate or tend to incriminate the person.

Hofseth argued that, in disclosing PTS files to the state, the district court violated AS 18.85.120(d) by releasing "information that might incriminate or tend to incriminate" him. According to Hofseth, this breach of confidentiality led directly to the seizure of the DeLorean which, in turn, resulted in his prosecution for insurance fraud.

Hofseth bolstered his statutory argument by claiming that, if AS 18.85.120 were read to authorize the release of the PTS records in his case, the statute would violate his right against self-incrimination. United States Constitution, Amendment V; Alaska Constitution, Art. I, § 9. In support of this argument, Hofseth cited *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968), which prohibited a defendant's suppression-hearing testimony from being used against the defendant at trial, finding that "it would be intolerable that one constitutional right should have to be surrendered to assert another." At least two federal circuit courts of appeal have extended the *Simmons* rationale to financial statements by defendants applying for public representation. *See United States v. Anderson,* 567 F.2d 839, 840–41 (8th Cir.1977); *United States v. Branker,* 418 F.2d 378, 380 (2d Cir.1969). *See also United States v. Kahan,* 415 U.S. 239, 243, 94 S.Ct. 1179, 1181, 39 L.Ed.2d 297 (1974); *United States v. Hutson,* 843 F.2d 1232 (9th Cir.1988) (both reserving the issue).

Following an evidentiary hearing, Judge Michalski granted Hofseth's motion to suppress. Judge Michalski found that Hofseth's statements to PTS and the court were compelled because Hofseth had been required to provide information concerning his financial status to secure his right to court-appointed counsel. The judge further found that the seizure of the DeLorean had resulted from the disclosure of Hofseth's financial information.

Although the judge found the language of AS 18.85.120 somewhat confusing, he concluded that the statute must be interpreted to require that financial information submitted by an applicant for court-appointed counsel be kept confidential except for purposes of prosecuting perjury. For this reason, the judge believed that the state was effectively barred from using information gained from PTS records to pursue charges other than perjury. Judge Michalski noted that an exception would apply if a perjury investigation yielded evidence of other criminal misconduct that was wholly unrelated to any financial information the defendant might have provided. However, the judge found that Hofseth's charges were closely related to the infor-

mation contained in the disclosed records. The judge thus concluded that suppression of the DeLorean was warranted.[1]

## DISCUSSION

With minor reservations, which have no effect on the outcome of this case, we find Judge Michalski's reading of AS 18.85.120 to be basically sound. We are unpersuaded by the state's arguments to the contrary.

The state's principal, and most meritorious, claim begins with the observation that the right against self-incrimination protects only against the use of incriminating statements that have been compelled. One who discloses incriminating information voluntarily, under no compulsion to do so, cannot complain of its subsequent use by the state. For this reason, the validity of the superior court's ruling in this case turns initially on the correctness of Judge Michalski's determination that Hofseth's statements to the district court and PTS were "compelled" in the constitutional sense.

The state argues that the superior court erred in finding that Hofseth's disclosures were compelled. The state points out that "the Fifth Amendment privilege does not condone perjury." *United States v. Wong,* 431 U.S. 174, 178, 97 S.Ct. 1823, 1825, 52 L.Ed.2d 231 (1977). Committing perjury is not a viable substitute for asserting the privilege against self-incrimination; a person asked to give incriminating testimony may assert the privilege but is never justified in testifying falsely. *Id.; United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969). Because perjured statements are not deemed "compelled" for fifth amendment purposes, the state argues that the superior court was mistaken in finding Hofseth's statements to PTS and the district court to have been compelled.

■ A partial answer to the state's argument is the superior court's recognition that the state was in no manner barred from using the disputed PTS records to prosecute Hofseth for perjury. We emphasize our agreement with Judge Michalski's ruling on this score. The constitution's protections against self-incrimination afforded Hofseth no shelter against a prosecution for perjury. Nor can the prohibitions in AS 18.85.120(d) against release of "information that might incriminate or tend to incriminate" an applicant for court-appointed counsel be construed to preclude disclosure for purposes of a perjury prosecution. Insofar as the Public Defender Act's confidentiality provisions may be likened to an assurance of immunity, it is clear that the immunity would not extend

---

1. Judge Michalski's written order granting the motion to suppress provided, in relevant part, as follows:

> Alaska law and procedure requires that a person seeking appointed counsel make a sworn statement regarding income and assets. The statute provides that at the end of the related case such statements may be made available to the attorney general for appropriate actions but that incriminatory statements are to be removed. This rather confusing language, in contrast with the swearing requirement, leads this court to believe that the contents of compelled statements in application for legal services may be used to prosecute perjury but not other crimes relating to the property listed in the compelled statement. In other words, the constitutional prohibition against compelled statements requires this court to recognize a use immunity for statements made to obtain counsel. This "springing immunity" would not reach to nonproperty crimes or to property crimes sufficiently attenuated from the inquiry into the existence or nonexistence of the applicant's assets.

> Here the defendant claimed to have no assets. And it is from that statement that the referral to the district attorney's office arose, and the rebuttal of which may prove perjury. The investigation related to the DeLorean is a fruit of that referral and use immunity requires suppression of the evidence seized for purposes of a non-perjury prosecution.
>
> ... This court recognizes that it is possible that totally unrelated crime might be discovered in the course of a perjury investigation, and not only ought to be but may be prosecuted if sufficiently attenuated from the "statement" made by the applicant for appointed counsel. Here, however, the ownership of the DeLorean and use and availability of insurance proceeds from it were specifically part of the property issues raised by pretrial services in rejecting Hofseth's application. Therefore, it is proper that the "springing immunity" required by both statute and constitution reach to the prosecution for insurance fraud in this case.

to prosecution for false statements made in connection with applications for public representation. *See, e.g., United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) (grant of immunity does not protect against prosecution for perjury committed while immunized).

■ Recognition that Hofseth could be prosecuted for perjury is only a partial answer to the state's argument that his statements were mistakenly found to be compelled. In the case of a fraudulent application for court-appointed counsel— that is, an application submitted by a person financially able to retain counsel and aware of that ability—the basic claim of indigency required under AS 18.85.120(d) is itself untruthful. Because an applicant who has the wherewithal to pay for an attorney and knows that fact is in no sense compelled to declare indigency for purposes of obtaining court-appointed counsel, none of the subsidiary information provided to support the fraudulent application could be deemed compelled, whether truthful or not. Disclosure of that information would not violate the right against self-incrimination, and prosecution of any crimes based on the disclosure would be the fruit of no such violation.[2]

The same rationale would apply in the case of a nonfraudulent application if disclosure of information to the state under AS 18.85.120(d) were limited to a specific false statement or statements. In that event, charges stemming from investigation of the disclosed information would at most be the fruit of perjured, and therefore not "compelled," statements. The privilege against self-incrimination would not bar the charges, regardless of whether they were for perjury or some other offense.

In the present case, the superior court's decision implies that Hofseth could not have been charged with insurance fraud or other related crimes even if his application for court-appointed counsel had proven fraudulent or if the records released to the state had consisted exclusively of perjured statements. To this extent, Judge Michalski's ruling may be incorrect. It is clear, however, that any error in the scope of the superior court's decision has no effect on Hofseth's case.

Here, the state has never demonstrated that Hofseth's basic claim of indigency was fraudulent—that is, that Hofseth applied for public representation knowing himself to be capable of affording his own attorney. The record establishes neither Hofseth's actual financial ability to retain counsel nor an awareness on his part of that ability. At the February 12, 1988, hearing before Judge Fuld, Hofseth candidly expressed uncertainty about his ability to afford counsel. The fact that Hofseth has been represented by court-appointed counsel throughout the course of the current proceedings provides at least some indication that his uncertainty was well founded.

Nor has the state established that the records disclosed to it by the district court were limited to specific statements that were actually perjured. In fact, the contrary appears to be the case. Suzanne Rogers' memorandum to Judge Fuld, which precipitated the disclosure, summarizes all of the information given by Hofseth, as well as information derived from PTS's investigation thereof, and indicates Rogers'

---

**2.** This point is clearly made in *United States v. Kahan,* 415 U.S. at 243, 94 S.Ct. at 1181, where the United States Supreme Court held that, even assuming the rationale in *Simmons v. United States* applied in the context of requests for court-appointed counsel, that rationale could not protect a fraudulent applicant from prosecution:

> Here, by contrast, the incriminating component of respondent's pretrial statements derives not from their content, but from respondent's knowledge of their falsity. The truth of the matter was that respondent was not indi-

gent, and did not have a right to appointment of counsel under the Sixth Amendment. We are not dealing, as was the Court in *Simmons,* with what was "believed" by the claimant to be a "valid" constitutional claim, see n. 2, supra. Respondent was not, therefore, faced with the type of intolerable choice *Simmons* sought to relieve. The protective shield of *Simmons* is not to be converted into a license for false representations on the issue of indigency free from the risk that the claimant will be held accountable for his falsehood.

suspicion that some of the statements Hofseth made were perjured. The memorandum and, later, the entirety of the PTS files on Hofseth were released to the state for investigation of any possible perjury they might reveal.

▪ To the extent that they contained false information, the PTS records did not involve compelled statements. But compelled statements were divulged to the extent the records contained truthful information.[3] In disclosing PTS records to the state, the district court made no attempt to differentiate the true from the false or to withhold the former. There has been no showing that the state's investigation was prompted by or limited to any particular statement or statements that were actually false.

In concluding that Hofseth's statements had been compelled, Judge Michalski implicitly recognized that this case involved the undifferentiated disclosure of all information provided by Hofseth for a generalized investigation of potential perjury. In relevant part, Judge Michalski ruled:

> Here, the defendant claimed to have no assets. And it is from that statement that the referral to the district attorney's office arose, and the rebuttal of which may prove perjury. The investigation related to the DeLorean is a fruit of that referral....

It is in this sense that Judge Michalski concluded that "the information at the very root of the investigation was information obtained in a compelled statement...." Judge Michalski did not err in reaching this conclusion.

▪ We must address two other arguments advanced by the state. The state argues that disclosure of Hofseth's financial information could not have violated AS 18.85.120(d) because that provision does not cover the type of statements disclosed in this case.

The state supports its position by emphasizing that AS 18.85.120(d) prohibits the release of "information that might incriminate or tend to incriminate" a defendant only when that information is "received under this subsection." The state notes that subsection (d) requires defendants to "execute a general waiver authorizing the release ... of income information regarding any income source the [defendant] has had...." In the state's view, only third-party information obtained in reliance on such waivers qualifies as "information received under this subsection."

According to the state, it is subsection (b) of AS 18.85.120, not subsection (d), that deals specifically with financial statements made by the defendant personally. Subsection (b) requires, in relevant part, that defendants "shall certify under oath ... ma-

---

3. As has been indicated by our prior discussion, information given by Hofseth to PTS could not have been deemed potentially incriminatory and thereby shielded from disclosure merely by virtue of its untruthfulness or its tendency to implicate Hofseth in the commission of perjury. However, to the extent that Hofseth's statements to PTS or the district court, or PTS's investigation of those statements, disclosed truthful information that could have incriminated Hofseth in offenses other than perjury, then the information was potentially incriminatory. Despite the express provision in AS 18.85.120(d) prohibiting the release of incriminatory information, Hofseth was given no advance opportunity to identify potentially incriminating statements and to request that such statements not be released to the state. We realize that, as an alternative to construing AS 18.85.120(d) to generally preclude charges other than perjury (a result characterized by Judge Michalski as "springing immunity"), we might read the provision to require pre-disclosure notice to the defendant and an opportunity to claim privilege and request nondisclosure of specific information. Such a cumbersome procedure does not appear to have been contemplated by the drafters of the Public Defender Act, however, and its implementation would have the undesirable effect of alerting persons suspected of perjury to the fact that an investigation was contemplated by the state. We thus interpret AS 18.85.120(d) to allow the court, in its discretion, to release PTS records without first attempting to differentiate perjured information from unperjured, or incriminatory information from nonincriminatory; we similarly read the statute to allow the state to rely on the entirety of the disclosed information in investigating potential perjury charges. We hold only that, when undifferentiated disclosure of PTS records leads to evidence of crimes other than perjury, prosecution for such crimes cannot be based on that evidence unless the case falls within one of the exceptions we have recognized in this opinion.

terial factors relative to [their] ability to pay that the court prescribes." The state maintains that the PTS information released by the district court in this case consisted of first-party financial statements made by Hofseth, not third-party information received from others, and that these statements were thus "received under" subsection (b), not subsection (d). Because subsection (b), unlike subsection (d), contains no provision for confidentiality, the state reasons that the disclosure in Hofseth's case involved no statutory violation.

Initially, we note that the PTS information disclosed by the court to the state in this case included not only Hofseth's personally given financial statements and testimony, but also the results of preliminary investigation into Hofseth's assets by Suzanne Rogers, who obtained third-party information and included it in her notes. Among the information specifically included in Rogers' notes was the fact that a DeLorean was registered to Brodsky, that the DeLorean had been signed over to Brodsky by Hofseth, that the car had been reported stolen, and that, as a result of the theft, a $22,000 insurance payment had been made.

Even were this not so, the state's reading of subsection (d) is overly restrictive. In addition to requiring applicants to execute a written waiver as to third-party information, subsection (d) expressly requires them to "affirm indigency under oath to the court." There is simply no basis here for concluding that Hofseth's sworn testimony and notarized financial statements are not an integral part of the oath of indigency required of him under subsection (d). In this regard, it is noteworthy that the financial disclosure forms Hofseth filled out for PTS incorporated the basic oath of indigency required under subsection (d): "I wish to have a lawyer and cannot afford to pay for one. I request that the court appoint a lawyer to represent me."

The superior court did not err in finding that the information disclosed in this case was "received under" AS 18.85.120(d).[4]

■ The state also contends that, even if release of the disputed financial statements was improper, the impropriety should not have resulted in suppression of the DeLorean. The state emphasizes that Hofseth's DeLorean was seized in the course of a legitimate perjury investigation. Even though the state does not deny the causal link between release of the PTS records and seizure of the DeLorean, it contends that the relationship between the disclosure and the seizure is "so attenuated as to dissipate the taint" of illegality. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). The state relies particularly on *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), and *United States v. Hooton*, 662 F.2d 628 (9th Cir.1981). Both cases apply the attenuation doctrine to uphold the voluntary testimony of a witness whose identity was disclosed as a result of an unlawful search.[5]

In ordering the DeLorean suppressed, however, Judge Michalski recognized the attenuation doctrine and found it inapplicable. The judge expressly indicated that the state would not have been precluded from prosecuting Hofseth for a crime other than perjury discovered in the course of the perjury investigation only if the other crime was essentially unrelated to the type of information provided in Hofseth's financial statements.

**4.** Given our conclusion as to the applicability of the statutory restriction on release of incriminatory information contained in AS 18.85.120(d), we need not address the state's argument that, in the absence of statutory prohibition, release of Hofseth's financial statements would not have violated his constitutional privilege against self-incrimination.

**5.** The state also mentions the independent source and inevitable discovery doctrines. *See, e.g., Erickson v. State*, 507 P.2d 508, 516 (Alaska 1973); *Cruse v. State*, 584 P.2d 1141, 1145 (Alaska 1978). In the present case, however, the state never laid the factual groundwork to support either doctrine. Below, the state did not allege or prove that the discovery of Hofseth's DeLorean was occasioned by a source independent of the perjury investigation prompted by disclosure of Hofseth's financial statements. Nor did the state establish that the DeLorean would inevitably have been discovered despite the challenged disclosure. Thus, neither the independent source nor the inevitable discovery doctrine is germane here.

In our view, Judge Michalski drew the appropriate line in applying the attenuation doctrine to Hofseth's case. The state may have a strong interest in discovering misconduct other than perjury when asked to investigate potentially perjured information provided by a person who has already been charged with a crime. A loose application of the attenuation doctrine could only encourage abuse. Conversely, public policy demands that information provided by applicants for court-appointed attorneys be freely available to the state for investigation of potential perjury. By assuring that only perjury charges could be brought in all but exceptional cases of disclosure under AS 18.85.120(d), a more circumscribed application of the attenuation doctrine would promote full disclosure of records in appropriate cases, with no chilling effect on *bona fide* applicants for appointed counsel.

Here, the seizure of Hofseth's DeLorean was a consequence of the district court's release of his records. In causal terms, the challenged seizure was a fruit of the disclosure. As a result of the DeLorean's seizure, Hofseth was charged with property offenses of the type that might reasonably be expected to be discovered during an investigation of a person's assets and liabilities. Far from involving fortuitous, unrelated criminal misconduct, Hofseth's alleged crimes involved property and conduct specifically discussed by Hofseth in his statements and testimony to PTS and the court. Hofseth's statements concerning the DeLorean were investigated by Suzanne Rogers, who specifically included in the disclosed PTS records the information that Hofseth had transferred the DeLorean to Brodsky, that it had been reported stolen, and that a substantial insurance payment had been made as a result of the theft.

Given these circumstances, we find that the superior court did not err in concluding that the DeLorean was a fruit of the disclosure of Hofseth's PTS records and that its seizure was not so attenuated from the disclosure as to dissipate the taint. *See, e.g., United States v. Schipani*, 289 F.Supp. 43 (E.D.N.Y.1968).

## CONCLUSION

▪ In summary, we conclude that the superior court correctly ruled that evidence resulting from an investigation prompted by release of information under AS 18.85.120(d) may generally be used only to prosecute for perjury. The general rule is subject to two exceptions. First, when a perjury investigation originates from disclosure of information submitted in support of a fraudulent application for court-appointed counsel or from disclosure of statements that are shown to have been perjured, then prosecution of incidental crimes discovered during the investigation is not barred. Second, as recognized by the superior court, when a perjury investigation stemming from a disclosure under AS 18.85.120(d) fortuitously yields evidence of misconduct essentially unrelated to the type of information in the disclosed materials, then the attenuation doctrine will apply, and the misconduct may be prosecuted. Because neither exception is applicable here,[6] the superior court correctly granted Hofseth's motion to suppress.

The order of suppression is AFFIRMED.

MANNHEIMER, J., not participating.

## ORDER ON REHEARING
### February 6, 1992

The state has petitioned for rehearing, raising two issues. We conclude that,

---

6. Our holding is necessarily limited by the facts and legal theories developed by the parties before the superior court. During the superior court proceedings on the motion to suppress, the state did not claim or attempt to prove that Hofseth's application for appointed counsel was fraudulent or that any particular statement leading to his insurance fraud charges was perjured. Likewise, the state has advanced no such claim before this court. However, we do not preclude the state from applying to the superior court for reconsideration if the state believes that it has been afforded an inadequate opportunity to present evidence on the applicability of either exception to Hofseth's case. Nor do we preclude the superior court from reconsidering its ruling in light of our decision if, in the court's discretion, reconsideration may be warranted on any other ground.

while neither issue requires rehearing, both warrant the addition of clarifying language to this court's opinion.

First, the state has asked this court to reconsider the portion of our decision appearing at pages 1382 and 1383, which the state reads as barring all non-perjured Pre–Trial Services (PTS) information from being disclosed by the court or relied on by the state for purposes of investigating possible perjury charges. We believe the state has misread the pertinent portion of our opinion. Footnote 3 on page 1383 was meant to make it clear that the state is not barred from relying on non-perjured PTS information in conducting a perjury investigation. To further clarify the point, we direct that the following language be added at the end of footnote 3:

[Editor's Note—This language has been incorporated in the publication of the opinion]

Second, the state asks that this court, instead of affirming the superior court's ruling, remand for further proceedings to determine whether Hofseth's case falls within one of the two exceptions specified at page 1385. Our opinion, however, would not preclude the superior court, upon return of jurisdiction from this court, from granting the state the relief it seeks if the superior court concludes that the state has not been afforded a fair opportunity to present evidence on the issue. To ensure that the superior court does not believe itself barred from further consideration in the event the state files a motion for reconsideration, we direct that the following footnote be added on page 1385, immediately following the language, "Because neither exception is applicable here,":

[Editor's Note—footnote 6 has been added in the publication of the opinion]

Entered at Anchorage, Alaska, this 6th day of February, 1992, by direction of the court.