

# NUMBER 13-10-00546-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

BNSF RAILWAY COMPANY,                                    Appellant,

v.

CARLOS DONAWAY,                                              Appellee.

### On appeal from the 9th District Court
### of Montgomery County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Rodriguez

In this railroad accident case, appellant BNSF Railway Company challenges the jury's verdict in favor of appellee Carlos Donaway. Donaway, an engineer for the railway, sued BNSF for injuries he alleges he sustained as a result of a collision between a locomotive he was driving and a set of standing railcars. By four issues, which we consolidate and address as three, BNSF disputes the trial court's charge to the jury on the

"Radio Rule," which governs the communications used in shoving, backing, or pushing movements by trains, *see* 49 C.F.R. § 220.49 (2012); the trial court's failure to include an aggravation of injury instruction in the jury charge; and the evidence supporting the jury's award of past lost earning capacity. We affirm.

## I. Background[1]

On March 18, 2009, Donaway was involved in an accidental collision at the Beach Siding rail yard in Conroe, Texas. Donaway and two other BNSF employees—conductor Robert Gaines and brakeman Patrick Horn—were picking up several railcars to take to another location. To pick up the standing railcars, the three-man crew used two locomotives coupled together. Donaway rode the east-facing locomotive that was travelling backward toward the standing railcars; Gaines rode the west-facing locomotive that was travelling forward toward the standing railcars. Donaway, as engineer, was responsible for driving the locomotives; Gaines, as conductor, was responsible for giving Donaway directions to the standing railcars as Donaway was driving blind from where he sat in his backward-traveling locomotive. Donaway approached the standing railcars from the east, driving the locomotives west. He had to back the locomotives through a railroad crossing to reach the standing railcars.

As the locomotives approached the crossing, Gaines gave Donaway directions over the radio in the form of "car counts." A car count is a unit of measurement communicated by conductors to engineers to aid the engineer in backing operations. For example, if a conductor informs an engineer that he is ten cars from a crossing, the

---

[1] This case is before the Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

2

engineer knows that the locomotive is ten car-lengths from the crossing. Because rail cars are approximately fifty feet in length, the engineer knows that the locomotive is approximately 500 feet from the crossing.

Gaines began the backing operation riding outside the cab of his locomotive. While riding outside the cab, Gaines radioed to Donaway over his handset that the locomotive was twenty to twenty-five cars from the crossing. When his handset began malfunctioning, Gaines moved inside the cab, turned off his handset, and continued to give Donaway car counts from the cab radio. From the cab radio, Gaines gave Donaway three more counts: ten cars to the crossing; six cars to the crossing; and finally, three cars to the crossing. When the locomotives reached the crossing, Gaines blew the train's whistle and then moved back outside the cab. From outside the cab, Gaines began giving Donaway further car counts on the other side of the crossing, but Donaway did not hear these counts because Gaines had not turned his handset back on.

It is undisputed that the last car count Donaway heard was the "three to the crossing" count and then heard Gaines blow the train's whistle, signaling that they were passing the crossing. After the last car count and whistle, Donaway continued to back the locomotives, continuing on the west side of the crossing and eventually colliding with the standing railcars.

Donaway filed suit against BNSF, claiming that he injured his neck in the collision. Donaway claimed that BNSF was negligent for leaving the standing railcars too close to the crossing and was liable for Gaines's violation of the Radio Rule. The case was tried to a jury.

After the close of evidence, BNSF moved for a directed verdict, arguing that, as a

matter of law: Gaines could not have violated the Radio Rule because it only applied to engineers[2]; and the evidence showed that Donaway violated the rule. The trial court denied BNSF's motion. At the charge conference, BNSF objected to the inclusion of a question asking the jury whether both Donoway and Gaines violated the Radio Rule; the trial court included the Radio Rule question as to both Donaway and Gaines.

At the charge conference, BNSF also requested that an instruction be included in the charge instructing the jury that it could not include damages for any condition suffered by Donaway before the collision unless the condition was aggravated by the collision. Donaway did not object to the aggravation instruction, and the trial court allowed it. But when the trial court was reading its charge to the jury, it became apparent that the aggravation instruction had not been included in the charge; the charge included a pre-existing condition instruction that the parties had discussed earlier in their charge negotiations before settling on the aggravation instruction.[3] BNSF objected to the missing aggravation instruction, but the trial court overruled BNSF's objection and refused to include the instruction. Instead, in the charge it gave to the jury, the trial court made a handwritten strikeout through the pre-existing condition instruction.

In the trial court's charge, the jury was asked whose negligence caused the collision; the jury answered that both BNSF and Donaway's negligence were the legal causes. The jury was then asked whether either Gaines or Donaway violated the Radio Rule; the jury answered that only Gaines violated the Radio Rule. The jury then answered that Gaines's violation of the Radio Rule was a legal cause of the collision.

---

[2] BNSF also moved for partial summary judgment on this basis.

[3] The pre-existing condition instruction read as follows: "Do not include any amount for any condition existing before the occurrence in question."

4

Next, the jury was given a proportionate liability question; it answered that BNSF was ninety percent responsible for the collision and that Donaway was ten percent responsible. Finally, the jury awarded damages totaling $810,000: $114,000 for past lost earning capacity; $456,000 for future lost earning capacity; $70,000 for past physical pain and mental anguish; $20,000 for future physical pain and mental anguish; $45,000 for medical expenses; $40,000 for past physical impairment; and $65,000 for future physical impairment.

BNSF moved for judgment notwithstanding the verdict on the basis that: as a matter of law, Gaines could not violate the Radio Rule as it only applied to engineers; and the jury's $114,000 award for past lost earning capacity was unsupported by the evidence. The trial court denied the motion. Donaway then moved for entry of judgment, in which he argued that he was entitled to the full amount of damages because the Radio Rule was a safety statute and thus imposed strict liability on BNSF. In its final judgment, the trial court awarded Donaway the full $810,000 in damages found by the jury. BNSF filed a motion for new trial, which was overruled by operation of law.

## II. The Radio Rule

By its first issue, BNSF argues that the trial court erred in submitting a question to the jury that allowed it to find that either Donaway or Gaines violated the Radio Rule. BNSF argues that, as a matter of law, the duty to stop created by the Radio Rule applies only to engineers and not conductors, and the trial court's charge that allowed the jury to find that Gaines violated the Radio Rule therefore included an invalid theory of law. BNSF argues that because the jury charge commingled invalid and valid theories of law, we cannot determine whether the jury based its verdict on the invalid theory, and as a

5

result, we must remand for a new trial. BNSF also argues that the evidence at trial shows, as a matter of law, that Donaway violated the Radio Rule, and the trial court therefore erred in submitting the Radio Rule issue to the jury; BNSF argues that the trial court should have ruled that Donaway's actions were negligence per se, instructed the jury accordingly, and submitted only a causation question to the jury regarding Donaway's actions in the accident.

## A. Standard of Review

The standard of review for jury charge error is whether the trial court abused its discretion. *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or if it acts without reference to any guiding rules or principles. *Id.* A trial court acts without reference to guiding rules and principles if it submits to the jury theories of liability that are not legally viable—in other words, theories that have not been pled, are not supported by the legally sufficient evidence, or are not supported by applicable law. *See* TEX. R. CIV. P. 277 (requiring that the trial court submit issues that are raised by the pleadings and the evidence); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) (reasoning that Rule 277 implicitly mandates that the jury be able to base its verdict on legally valid questions and instructions); *see also* TEX. R. CIV. P. 278.

We may not reverse a judgment based on charge error unless the error is harmful. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749-50 (Tex. 1980). A jury charge error is harmful only if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1(a).

6

## B. Does the Radio Rule Apply to Engineers Only?

To determine whether the trial court's instruction to the jury on the Radio Rule was in error, we must first determine the applicability of the rule. The Radio Rule provides as follows:

> When radio communication is used in connection with the shoving, backing or pushing of a train, locomotive, car, or on-track equipment, the employee directing the movement shall specify the distance of the movement, and the movement shall stop in one-half the remaining distance unless additional instructions are received. If the instructions are not understood, the movement shall be stopped immediately and may not be resumed until the misunderstanding has been resolved, radio contact has been restored, or communication has been achieved by hand signals or other procedures in accordance with the operating rules of the railroad.

49 C.F.R. § 220.49.

BNSF argues that the Radio Rule creates a duty to stop and that duty applies only to locomotive engineers as it is the engineer who is receiving the directions and is the only employee in the position to stop the train if there is a break-down in communications. We agree with BNSF's argument in this regard. As posited by BNSF, it defies logic to suggest that a rule designed to improve the safety of backing movements by trains would impose the duty to stop on the conductor, an employee who may or may not have access to a brake or other means to stop the train. *See id.*; *see also Waggoner v. Ohio Cent. R.R., Inc.*, No. 2:06-CV-250, 2007 WL 6148515, at *1 (S.D. Ohio Dec. 31, 2007) (agreeing that the Radio Rule is a safety statute as contemplated by the Federal Employers Liability Act, which governs personal injury suits by railroad workers). The plain language of the rule clearly places that burden on the employee receiving the movement instructions, the engineer—only the engineer will know if he has or has not received the necessary additional instructions, the lack of additional instructions being the

7

indication that there has been a communications break-down.  *See U.S. v. Apfelbaum*, 445 U.S. 115, 121 (1980) ("[A]bsent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language."); *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008) ("When interpreting a statute, we look first and foremost to the plain meaning of the words used.  If the statute is clear and unambiguous, we must apply its words according to their common meaning in a way that gives effect to every word, clause, and sentence . . . ." (internal quotation and citations omitted)).

Nevertheless, we disagree with BNSF's contention that the Radio Rule creates *only* a duty to stop that is imposed on the engineer.[4]  The plain language of the rule also imposes a duty on the employee directing the movement of the train to specify the distance of that movement.  *See Apfelbaum*, 445 U.S. at 121; *First Am. Title Ins. Co.*, 258 S.W.3d at 631; *see also Belle v. New Orleans Pub. Belt R.R. Comm'n*, Civil Action No. 09-2757, at *1-3 (E.D. La. May 17, 2010) (applying the Radio Rule to a conductor's

---

[4] BNSF cites a series of cases for this contention, but none specifically hold that the Radio Rule creates only a duty to stop that is imposed only on the locomotive engineer.  In *Waggoner v. Ohio Central Railroad, Inc.*, the plaintiff conductor sued for injuries sustained when he jumped off a train just before it collided with some standing railcars.  No. 2:06-CV-250, 2007 WL 4224217, at *1 (S.D. Ohio Nov. 27, 2007).  The court in that case granted partial summary judgment to the plaintiff, holding that the engineer's failure to stop the train despite losing communication with the conductor giving directions violated the Radio Rule.  *Id.* at *9-10, 12.  The court's holding was based on undisputed testimony by the engineer that he had violated the rule, *id.*; the court made no broad pronouncement regarding the duties created by the Radio Rule or the applicability of the Radio Rule to engineers only.  BNSF also relies on *Pierce v. Chicago Rail Link, LLC*, No. 03-C-7524, 2006 WL 3370343, at *5-7 (N.D. Ill. Nov. 20, 2006), and *Walden v. Illinois Central Gulf Railroad*, 975 F.2d 361, 364-65 (7th Cir. 1992), both cases in which a plaintiff conductor or brakeman sued for injuries caused by an engineer's violation of the Radio Rule.  In *Pierce*, the court reversed the jury verdict in favor of the railroad and granted a new trial on the basis of evidence showing the engineer's conduct violated the Radio Rule and caused the accident.  2006 WL 3370343, at *6-7.  In *Walden*, the Seventh Circuit upheld the trial court's denial of the plaintiff's judgment notwithstanding the verdict, holding that, although the railroad's engineer had violated the Radio Rule and was thus negligent per se, there was evidence at trial that the negligence did not cause the plaintiff's injury.  975 F.2d at 364-65.  Like in *Waggoner*, in neither *Pierce* nor *Walden* did the courts hold that the Radio Rule does not apply to the actions of a conductor.  As such, we are not persuaded by BNSF's reliance on these cases.

8

failure to give accurate car counts). As such, we cannot conclude that, as a matter of law, the Radio Rule applies only to the locomotive engineer.

At trial in this case, part of BNSF's strategy was to prove that Donaway violated his duty to stop under the Radio Rule. But our review of the record indicates that part of Donaway's strategy at trial was to prove that Gaines violated the Radio Rule, as well, by not giving prompt and accurate car counts once the train passed the crossing. Because the Radio Rule applies both to the actions of the engineer and the conductor and because the evidence at trial raised both Donaway and Gaines's duties under the rule, we conclude that the trial court did not abuse its discretion in submitting a question to the jury asking whether both Donaway, the engineer, and Gaines, the conductor, violated the rule.[5] *See Tex. Dep't of Human Servs.*, 802 S.W.2d at 649; *see also* TEX. R. CIV. P. 277, 278.

## C. Did Donaway Violate the Radio Rule as a Matter of Law?

BNSF next argues that the evidence at trial showed, as a matter of law, that Donaway violated the Radio Rule, and therefore, the trial court erred in submitting a question to the jury that asked whether Donaway violated the rule. BNSF argues that the trial court should have, instead, instructed the jury that Donaway's violation was negligence per se and asked only whether Donaway's violation was a cause of the accident before asking the proportionate liability question. BNSF argues it was harmed by this error because the jury did not take Donaway's violation of the Radio Rule into account when it allocated responsibility in the proportionate liability question.

---

[5] We need not reach BNSF's argument that it was harmed by the inclusion of an invalid theory in the jury charge which requires a new trial because we found no error in the charge regarding Gaines's violation of the Radio Rule. *See* TEX. R. APP. P. 47.1.

We agree with BNSF that the evidence conclusively showed that Donaway violated the Radio Rule. At trial, Donaway testified that the last car count he received from Gaines was "three to the crossing." In his appellate brief, Donaway contends that when Gaines blew the train's whistle at the crossing, that amounted to an additional communication to Donaway that allowed him to continue the backing movement of the locomotives. But we cannot agree that the blowing of the train whistle was an additional direction under the Radio Rule. The direction contemplated by the Radio Rule necessarily includes a distance component; a communication without such specifics is insufficient to justify continued movement of the train by the engineer. *See* 49 C.F.R. § 220.49; *see also Pierce v. Chicago Rail Link, LLC*, No. 03-C-7524, 2006 WL 3370343, at *5-6 (N.D. Ill. Nov. 20, 2006) (holding that the Radio Rule "requires a conductor . . . directing movement of a locomotive to specify the distance of the movement"). So, given the undisputed evidence that the last instruction Donaway received was that the locomotive was three car lengths to the crossing, the Radio Rule required Donovan to stop the train in one-half the remaining distance of that instruction. *See* 49 C.F.R. § 220.49; *see also Pierce*, 2006 WL 3370343, at *5. By continuing through the crossing without stopping, Donaway violated the Radio Rule. Because the evidence raised no fact issue as to whether Donaway violated the Radio Rule, the trial court abused its discretion in submitting a question to the jury asking whether he did. *See Tex. Dep't of Human Servs.*, 802 S.W.2d at 649; *see also* TEX. R. CIV. P. 277, 278. The question remains whether this error harmed BNSF.

BNSF contends that the trial court should have instructed the jury that Donaway's violation of the Radio Rule was negligence per se and that the trial court's failure to

10

include that instruction affected the jury's allocation of responsibility in the proportionate liability question. Donaway's lawsuit was brought under the Federal Employers Liability Act (FELA), which was enacted to provide a federal remedy for injured railroad workers. *See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994); *see also* 45 U.S.C. §§ 51-60 (2006). FELA includes several substantive and procedural provisions governing the lawsuits brought by injured workers, including the following provision regarding a plaintiff's contributory negligence:

> In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: *Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.*

45 U.S.C. § 53 (2006) (emphasis added). While this provision allows a jury in a personal injury case against a railroad to reduce a plaintiff's damages proportionate to his contributory negligence, it also creates an exception when the railroad's actions constitute a violation of a safety statute. *See id.* When the railroad is found to have violated a safety statute, section 53 prohibits reduction of damages in light of a plaintiff's contributory negligence. *See id.*; *Walden v. Illinois Cent. Gulf R.R.*, 975 F.2d 361, 364 (7th Cir. 1992); *see also Belle*, 2010 WL 2010509, at *2; *Waggoner*, 2007 WL 6148515, at *1. Although technically an administrative regulation, the Radio Rule is considered a safety statute for purposes of the contributory negligence provision in FELA. *See* 45 U.S.C. § 54a (2006) ("A regulation, standard, or requirement in force, or prescribed by the

11

Secretary of Transportation [under its authority to promulgate railroad safety regulations] is deemed to be a statute under sections 53 and 54 of this title."); *see also Waggoner*, 2007 WL 6148515, at *1 ("[A] regulation[] promulgated by the Secretary of Transportation, such as 49 C.F.R. § 220.49 . . . , [is] deemed to be a 'statute[]' under this section of FELA."). Only when an employee's negligence is the sole cause of his injury may his negligence be used as a defense by the railroad employer. *Walden*, 975 F.2d at 364. Thus, if BNSF was found by the jury to have violated the Radio Rule, Donaway was entitled to recover the entire damage amount awarded by the jury unless the jury also found that Donaway's negligence was the sole cause of his injury. *See id.*

Here, despite the jury finding Donaway to be ten-percent responsible for the collision, the trial court awarded Donaway the full amount of damages found by the jury. *See* 45 U.S.C. § 53; *see also Belle*, 2010 WL 2010509, at *2; *Waggoner*, 2007 WL 6148515, at *1. To show that this outcome would have been any different under the applicable law—i.e., that it was harmed by the trial court's failure to instruct the jury that Donaway's violation of the Radio Rule was negligence per se—BNSF must show that inclusion of the instruction would have probably caused the jury to find that Donaway's violation was the sole cause of his injury. BNSF has made no such showing. BNSF does not contend that the evidence was insufficient to support the jury's finding that Gaines's violation of the Radio Rule was a cause of Donaway's injury. Neither does BNSF contend that Donaway's negligence was the sole cause of his injury. Given the unchallenged evidence at trial that BNSF's violation was a partial cause of Donaway's injury, BNSF cannot show that, had the jury been instructed as to Donaway's per se negligence, it would have found Donaway solely responsible for his injury. And without

12

such a showing, we have no basis on which to reverse the trial court's full damages award—BNSF's partial responsibility justified the trial court's full damages under the contributory negligence provision in FELA. BNSF has therefore not shown that the trial court's award was probably improper, and we cannot conclude that BNSF was harmed by the trial court's error.

## D. Summary

Having concluded that the trial did not err in submitting a question to the jury on Gaines's violation of the Radio Rule and that BNSF was not harmed by the trial court's erroneous questions regarding Donaway's violation of the Radio Rule, we overrule BNSF's first issue.

## III. Aggravation Instruction

By its second issue, BNSF argues that the trial court erred in refusing to submit an instruction to the jury that it could only award damages for injuries existing before the accident in this case if those injuries were aggravated by the injury sustained in this accident. BNSF argues that this error was compounded by the charge submitted to the jury, which included a pre-existing condition instruction that was marked out by the trial judge; BNSF argues that this handwritten strikethrough of the instruction prohibiting consideration of pre-existing injuries gave the jury the impression that it was permissible to award damages for Donaway's injuries that existed before the accident in this case. BNSF argues that the omission of this instruction coupled with the handwritten strikethrough probably caused the rendition of an improper verdict.

## A. Standard of Review

[A trial court is] required to give "such instructions and definitions as shall be proper to enable the jury to render a verdict." [TEX. R. CIV. P.

13

277]. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000). Determining necessary and proper jury instructions is a matter within the trial court's discretion, and appellate review is for abuse of that discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). One way in which a trial court abuses its discretion is by failing to follow guiding rules and principles. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

*Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009).

When a trial court refuses to submit a requested jury instruction, our ultimate focus is on whether the request was reasonably necessary to enable the jury to render a proper verdict. *Cleaver v. Cundiff*, 203 S.W.3d 373, 379 (Tex. App.—Eastland 2006, pet. denied) (citing TEX. R. CIV. P. 277; *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd)). Every correct statement of the law does not belong in the jury charge, and the trial court should not burden the jury with surplus instructions. *Id.* (citing *Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984); *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no writ)). A judgment will not be reversed for charge error unless it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. TEX. R. APP. P. 44.1(a).

## B.  Applicable Law

It has long been a settled rule in this state that, where a plaintiff in a personal injury suit is suffering from an infirmity not caused by the accident which is the basis of the suit, and where the injuries flowing from the prior existing infirmity and those flowing from the negligence of the defendant are closely connected and intermingled to the extent that the jury might become confused and allow for improper elements of damages, the trial court should affirmatively charge the jury that plaintiff is entitled to recover only to the extent that his injuries were aggravated by the defendant's negligence.

*Dallas Ry. & Terminal Co. v. Ector*, 131 Tex. 505, 507, 116 S.W.2d 683, 685 (1938).

14

## C.  Analysis

Here, BNSF presented evidence at trial that Donaway suffered injuries prior to the accident in this case:  (1) a lower-back injury caused by a similar collision at work in 2003; and (2) degenerative disc disease in his neck.  Donaway presented expert testimony at trial that the neck injury he claimed in this case was caused by the March 2009 collision and that he suffered no neck injuries prior to the collision.  Donaway also presented evidence that the sort of degenerative neck disease identified by BNSF was typical for a man of Donaway's age and would not have caused any noticeable symptoms at Donaway's age.  BNSF presented expert testimony that Donaway's neck injury, if any, arose from his pre-existing degenerative neck disease and was not caused by the collision.  With regard to his 2003 lower back injury, Donaway testified that he had completely recovered from it by March 2008.  There was no evidence that Donaway suffered any back pain or injury as a result of the March 2009 collision.

During closing arguments, counsel for BNSF made the following statement:

So I'm submitting to you and you were told that you are supposed to award for each injury that resulted from that occurrence, from that impact[,] from that collision, not that resulted from unnecessary surgery, not that resulted from anything else, not the degenerative disk [sic] disease that was already there, not from conditions that you see from CAT scans and MRIs that have been there for months and weeks and they're just natural and don't do anything but give a doctor . . . an excuse to operate.  You don't award for those conditions.  You award only what was from the accident and the numbers are zero.

The jury was then charged as follows regarding damages:  "What sum of money, if paid now in cash, would fairly and reasonably compensate Carlos Donaway for the injuries, if any, that resulted from the occurrence in question?"  "[O]ccurrence in question" was defined in the charge as "the incident involving Plaintiff, Carlos Donaway, which occurred

15

on March 18, 2009."

Having reviewed the evidence presented at trial, we cannot conclude the trial court abused its discretion in refusing to submit an aggravation-of-injury instruction to the jury. Although there was evidence presented of a pre-existing back injury, there was evidence Donaway had fully recovered from that injury, and there was no evidence that Donaway suffered any back injury as a result of the collision in this case. As to Donaway's neck injury, there was little to no evidence that the collision aggravated any pre-existing condition. Donaway's evidence and theory at trial was that the collision caused a new neck injury; he denied suffering any neck pain prior to the collision. BNSF's evidence was that there was no neck injury attributable to the collision, its theory being that if Donaway's degenerative neck disease could even be considered an injury, it predated the collision and exhibited no acute symptoms caused by the collision. It was reasonable for the trial court to conclude, based on this evidence, that there was no connection or intermingling between Donaway's 2003 back injury and pre-existing degenerative neck disease and the neck injury he suffered as a result of the March 2009 collision. *See id.* It was also reasonable for the trial court to conclude that the jury would not be confused by the foregoing evidence. *See id.* If the jury accepted Donaway's evidence and theories at trial, it would find that he suffered an acute neck injury resulting directly from the collision. If it accepted BNSF's evidence and theories at trial, it would find that Donaway suffered no neck injury attributable to the collision. In short, we find no support in the record for the theory that Donaway's claimed neck injury was but an aggravation of any prior neck injury. *See Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 855-56; *see also* TEX. R. CIV. P. 277. This was a matter left to the

16

discretion of the trial court, and we will not disturb the trial court's ruling based on the record before us. *See Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 855-56.

Even assuming that the evidence raised the aggravation issue, BNSF was not harmed by the trial court's refusal to include an instruction to that effect in the jury charge. In its charge, the jury was instructed to only award damages for injuries resulting from the "occurrence in question," which was defined in the charge as the March 2009 collision. Then, at closing argument, counsel for BNSF admonished the jury to confine its damages award to injuries suffered by Donaway as a result of the collision. Unless there is evidence to the contrary, we presume the jury followed the instructions given in the charge. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003). BNSF points to no evidence, and we find none, that the jury did not follow the charge it was given. And in light of the charge and argument by BNSF's counsel, we conclude that an aggravation charge was not reasonably necessary to ensure a proper verdict and would have been surplusage. *See Cleaver*, 203 S.W.3d at 379; *see also* TEX. R. CIV. P. 277; TEX. R. APP. P. 44.1(a).

BNSF argues that the trial court's handwritten strikethrough of the pre-existing condition instruction signaled the jury that it could consider Donaway's prior injuries in making its damages award. We find this argument to be speculative of the jury's thought processes, and we are not persuaded by it. It is just as likely the jury overlooked the marked-out instruction and followed the charge as written—a charge that limited damages only to those incurred as a result of the March 2009 collision. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 771.

Having concluded that the trial court did not abuse its discretion in refusing to

17

include an aggravation instruction in the jury charge and, even if it had, that any error in the charge was harmless, we overrule BNSF's second issue.

## IV.  Past Lost Earning Capacity

By its third issue, BNSF argues that the jury's award of $114,000 to Donaway for past lost earning capacity was supported by factually insufficient evidence. BNSF argues that the only testimony at trial related to Donaway's past lost wages specified the amount to be $54,000 and that the jury appears to have picked its $114,000 award "out of thin air." BNSF asks the Court for a remittitur of $60,000 or, in the alternative, a new trial on damages.

"Factual sufficiency is the sole remittitur standard for actual damages." *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986). In determining whether damages are excessive, we use the same test as for any factual insufficiency question. *Id.* Under a factual sufficiency review, we "examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust." *Id.*

Lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury. *Scott's Marina at Lake Grapevine, Ltd. v. Brown*, 365 S.W.3d 146, 158-59 (Tex. App.—Amarillo 2012, no pet.). Proof of loss of earning capacity is always uncertain and is left largely to the discretion of the jury. *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232 (Tex. App.—Texarkana 2008, pet. denied). Nevertheless, to support an award of damages for lost earning capacity, a plaintiff must present evidence sufficient to permit

18

a jury to reasonably measure earning capacity in monetary terms. *Tagle v. Galvan*, 155 S.W.3d 510, 519-20 (Tex. App.—San Antonio 2004, no pet.); *Durham Transp. Co., Inc. v. Beettner*, 201 S.W.3d 859, 864 (Tex. App.—Waco 2006, pet. denied). Evidence of past earnings is one of several non-exclusive, relevant factors that may be considered in determining lost earning capacity. *Tagle*, 155 S.W.3d at 519; *see City of San Antonio v. Vela*, 762 S.W.2d 314, 320 (Tex. App.—San Antonio 1988, writ denied) (holding that testimony regarding lost wages supported an award for lost earning capacity).

BNSF contends that the only evidence at trial of Donaway's past lost earning capacity came from Kenneth McCoin, Donaway's economics expert. McCoin testified that—based on Donaway's 2008 salary of $73,145, adding twenty percent for fringe benefits, subtracting twenty-one percent for the likelihood that Donaway may have been disabled or killed in that time period, and subtracting taxes, union dues, and other costs—Donaway's past lost earning capacity was $53,819. In his closing argument, counsel for Donaway asked the jury to award specifically this amount as past lost earning capacity. BNSF argues that, in light of this, the jury's $114,000 award was against the great weight and preponderance of the evidence.

But Donaway points to further evidence the jury could have considered. There was also evidence admitted at trial showing Donaway's exact earnings in the months preceding the March 2009 accident. This evidence showed that Donaway's earnings for January and February 2009, after taxes, averaged approximately $7,100 a month. There was also evidence that Donaway's lost household services—the value of the services Donaway provided at home, such as chores—totaled $1,057 a month. Finally, the evidence showed that fourteen months had passed between the accident and trial. If

the jury added $7,100 and $1,057, for a total of $8,157 lost earnings per month, and then multiplied that total by fourteen, it would have come up with $114,198. Rounded down, this calculation supports the jury's $114,000 award for past lost earning capacity.

BNSF contends that the foregoing amounts to "a complicated mathematical process" invented by Donaway to justify the jury's verdict. But as lost earning potential is uncertain, we leave the calculation of it largely to the discretion of the jury, and as there was evidence of past wages and other lost earning capacity in this case to support the amount awarded here, we cannot conclude that the jury acted unreasonably in finding that Donaway's past lost earning capacity was valued at $114,000. *See Rigdon Marine Corp.*, 270 S.W.3d at 232; *see also Tagle*, 155 S.W.3d at 519; *City of San Antonio*, 762 S.W.2d at 320. For this reason, we cannot conclude that the jury's award was so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pope*, 711 S.W.2d at 624. The evidence supporting the jury's past lost earning capacity award was supported by factually sufficient evidence, and BNSF is not entitled to a remittitur. We overrule BNSF's third issue.

## V. Conclusion

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 18th
day of October, 2012.

20